[Civ. No. 3917.   Third Appellate District.—January 18, 1930.]

BRYSON P. BLAIR et al., Respondents, v. GUARANTEE TITLE COMPANY OF LONG BEACH, INC. (a Corporation) et al., Appellants.

Linnell & Linnell, F. Linnell, Sr., and Frank M. Linnell for Appellants.

Russell H. Pray for Respondents.

PRESTON (H. L.), J., *pro tem.*—This is an appeal by defendants Guarantee Title Company of Long Beach and I. H. Wright from a judgment entered against them upon a verdict of a jury in the sum of $1750, in an action for damages growing out of a fraudulent real estate transaction.

The facts, as they existed at the time of the transaction hereinafter related, were briefly these: On June 16, 1925, Helen Wood Blair, the original plaintiff in this action, was residing with her husband at Orange, California, but was the owner of a house and lot at the corner of 17th and Rose Streets in the city of Long Beach, which she valued at $8,500, and which was encumbered by a mortgage in the sum of $5,000. The defendant A. E. Cronin was a real estate agent residing in Long Beach, and well acquainted with Mrs. Blair, having been her agent in one or two business transactions. Mrs. Blair had implicit faith and confidence in Cronin, and, at the time of the transaction hereinafter related, Mrs. Blair held a note against Cronin for the sum of $1,000 and, as security for the payment of said note, she held a bill of sale and the registration certificate for Cronin's automobile. Victor Bellotti was another real estate agent residing at Long Beach and a friend of Cronin, but unacquainted with Mrs. Blair. The defendant and appellant Guarantee Title Company was a corporation engaged in the title and escrow business in Long Beach, California. The defendant and appellant I. H. Wright was

an employee of said Guarantee Title Company, and was its escrow officer.

On said sixteenth day of June, 1925, Cronin, in company with Bellotti, called upon Mrs. Blair at her home in Orange, and Cronin told her that they could exchange her equity in the Long Beach property for a ranch of 160 acres at Minot, North Dakota. Bellotti told her his father was the former owner of this ranch, and that it was a very valuable piece of property, and was clear of all encumbrances. Bellotti and Cronin also stated many details relative to the crops grown on the North Dakota ranch, the land's adaptability, etc., and urged Mrs. Blair to make the exchange. Finally, upon the advice and at the urgent solicitation of Cronin, she agreed to the exchange—that is, she agreed to exchange her equity in the Long Beach property, and the $1,000 note and bill of sale and registration certificate, for a deed and a clear and unencumbered title to the 160-acre ranch in North Dakota. Cronin then presented to her a deed, which he had already prepared, for the Long Beach property *with the name of the grantee left blank.* Cronin and Bellotti then accompanied Mrs. Blair to a near-by notary public. The notary and Mrs. Blair, seeing there was no grantee named in the deed, insisted that a grantee should be inserted in the deed, but Cronin stated that he did not know the "initials of the owner of the North Dakota ranch," and that it would be all right to execute the deed without naming a grantee; that it was a common practice to leave the grantee blank, etc. Mrs. Blair and the notary apparently accepted Cronin's explanation as satisfactory, for she signed and acknowledged said deed and delivered it to Cronin, with the instructions to deposit it in escrow, to be exchanged for a deed and clear title to the North Dakota property. Cronin suggested that the appellant Guarantee Title Company be the escrow-holder, and Mrs. Blair consented to this suggestion. Cronin, on the same day, and after leaving Mrs. Blair, *inserted his own name in the deed as grantee.* On the same day, to wit, the sixteenth day of June, 1925, at 4:20 P. M., the deed was recorded in the recorder's office of Los Angeles County, *at the request of the appellant Guarantee Title Company,* and contained printed instructions on the back thereof to return when

recorded to the Guarantee Title Company of Long Beach, California.

On the same day, Cronin executed a trust deed on said Long Beach property to secure a loan of $1700, in which the appellant Guarantee Title Company was named as trustee for John A. Benell, the beneficiary. This trust deed was acknowledged before a notary public, who was also at the same time an employee of, and in the office of, the Guarantee Title Company. Said trust deed was recorded at the same time as the deed from Mrs. Blair to Cronin, and also *at the request of said Guarantee Title Company.* Two days later, and on June 18, 1925, Cronin again called at the office of said Guarantee Title Company in Long Beach and there, in the presence of appellant I. H. Wright, the escrow officer of said title company, and upon a blank form furnished by Wright, prepared what purports to be an escrow agreement between Mrs. Blair and James I. Butterfield, the owner of the North Dakota ranch, which agreement provides in part: "We, the undersigned, buyer and seller, enter into the following agreement and hereby instruct the Guarantee Title Company of Long Beach, to carry out the conditions and agreements hereby entered into within 30 days from this date; and in the event the conditions of this escrow have not been complied with at the expiration of 30 days, you are instructed to complete same at the earliest possible date thereafter unless written demand shall have been made upon you by the party not in default, otherwise the same is automatically extended. Seller James I. Butterfield . . . Address, Long Beach City, who agrees to sell the buyer, Helen Wood Blair . . . Address, 504 W. Lemon, Orange, California, who agrees to purchase . . . 160 acres in North Dakota . . . in exchange for house and lot, Cor. 17th and Rose, Long Beach, two lots in Bellflower, and Haynes sedan; subject to mortgage on house and lot of $5,000.00 . . . Interest, insurance and rents are to be prorated to date, close of escrow . . . The Guarantee Title Company of Long Beach is hereby instructed to draw the usual form of Grant Deed, Bill of Sale, from the Seller to the Buyer, and also as herein required and issue the title . . . in the names of new owner on both properties . . . Further instructions are buyer is to deliver to A. E. Cronin pink slip, bill of sale and note and bill of sale Mrs. Blair to

Cronin. The seller agrees to pay all of the taxes for the fiscal year of 1924 & 5 through this escrow if not already paid . . . The buyer and seller do each agree to pay their half of the escrow charges and expenses. It is agreed that this escrow and the papers and the funds deposited therein cannot be withdrawn by either party before the close of this escrow, and all charges paid without the written consent of both parties hereto. It is agreed that in case the seller performs his part of this agreement and the purchaser fails to make further deposit as herein required, the escrow deposit herein referred to shall be forfeited to the seller, and the Guarantee Title Company of Long Beach is hereby requested to pay same to the seller. It is also agreed that the Guarantee Title Company of Long Beach shall not be responsible for adjustments in rents, interest, insurance premiums or commissions, unless the correct amounts have been furnished the Guarantee Title Company of Long Beach by the interested parties.''

To this agreement, *Cronin, also in the presence of Wright, signed the name of "Helen Wood Blair, by A. E. Cronin,"* and *forged* the name of ''James I. Butterfield,'' the owner of the North Dakota ranch. Wright thereupon filed said purported escrow agreement in said Guarantee Title Company's office, and opened an escrow therein for this transaction and numbered it 7079. Wright testified, however, that the deed from Mrs. Blair to Cronin was never placed in escrow by Cronin or anyone else. The Blair deed bore no escrow number; neither did the trust deed.

A few days after delivering this blank deed to Cronin, and after Cronin and Wright opened the purported escrow above mentioned, Mrs. Blair, accompanied by her husband, went to the office of said title company in Long Beach, *and was there advised by Wright "that the exchange had been escrowed and that everything in it was coming along all right,"* and exhibited to her the purported signature of James I. Butterfield to said escrow agreement, but did not inform her that said name ''James I. Butterfield'' had been forged to said agreement by Cronin.

Thereafter, and on July 6, 1925, Wright wrote the following letter to Mrs. Blair:

"Mrs. Helen Wood Blair,
    "504 North Lemon street,
        "Orange, California.
                "Re our escrow 7079
"Dear Madam:

"Your escrow on the North Dakota quarter is nearing completion, but in order to finish this escrow, we must have a note of $1,000.00, and bill of sale given to you by Mr. Cronin, also bill of sale from you to him showing that he is the legal owner of his car.

"Kindly find bill of sale enclosed which you will please sign. Please return to this office at your earliest convenience.

                "Yours very truly,
                    "GUARANTEE TITLE COMPANY,
                "By I. H. WRIGHT, Escrow Officer."

In response to this letter, Mrs. Blair, in company with her husband, again visited the title company's office and delivered to Wright the said $1,000 note, bill of sale and registration certificate. On this occasion, Wright informed her "that the exchange was practically completed, and that the only thing that was delaying it was that the deed from Butterfield to her for the North Dakota property had been sent to North Dakota for recording, and as soon as it was returned, the escrow would be completed and the deal finally consummated." Wright, however, knew at that time *that this statement was false, that no deed had ever been placed in escrow or procured from Butterfield for the North Dakota ranch, and also knew that Butterfield had not agreed or authorized Cronin to make the exchange, and also knew, that Butterfield was entirely ignorant of any negotiations being carried on with Mrs. Blair by Cronin.*

Thereafter, and before Mrs. Blair had discovered that Wright's statements were false, and on July 23, 1925, A. E. Cronin conveyed the Long Beach property to Evelyn Ferguson, who was an innocent purchaser. This deed was also acknowledged before a notary public, who was at the same time in the employ of the Guarantee Title Company.

Thereafter, and in August or September, 1925, Wright was discharged by said title company as its escrow officer and clerk, and was succeeded by one J. Gordon Poe, and

on September 3, 1925, Poe wrote Mrs. Blair as follows: "I have just been in conference with your agent, Mr. A. E. Cronin, and I find things are in somewhat of a muddle. I have arranged with Mr. Cronin to come to this office at eleven o'clock Tuesday morning, September 8th, and meet you and Mr. Blair, if you can possibly come. This is very urgent and I must ask that you make it convenient to be here at that hour. There is nothing we can do until Tuesday, at which time Mr. Cronin has agreed that he will make a justifiable settlement with you."

In response to this letter, Mrs. Blair and her husband again called at the office of the title company in Long Beach, and were informed by Poe that Wright was no longer connected with the title company, and that the escrow was incomplete, and in a "mess," and that it contained only the thousand dollar note and the bill of sale and the registration certificate, and did not contain her deed or the deed from Butterfield for the North Dakota property. Thereupon, Mrs. Blair demanded of Poe the return of her deed that she had given Cronin, but was informed by Mr. Poe that the deed was not in the possession of the title company. Poe, however, returned to Mrs. Blair the $1,000 note. During this conversation, Mrs. Blair was informed by Mr. Poe that the purported signature of Butterfield to the escrow agreement was forged, and that no deed from Butterfield to her was ever procured or placed in escrow and that Butterfield never had agreed to the exchange and knew nothing of the purported transaction.

Through this information given by Poe, Mrs. Blair discovered for the first time that she had been defrauded out of her Long Beach property and that the title thereto had passed into the hands of an innocent purchaser.

Thereafter, and on the seventh day of October, 1925, C. E. Brumwell and Martha V. Brumwell brought an action against Mrs. Blair, Cronin, and the Guarantee Title Company and others to foreclose the $5,000 mortgage on the Long Beach property formerly belonging to Mrs. Blair. Mrs. Blair made no appearance in this action, and the decree of foreclosure and order of sale was finally entered and the property sold pursuant to this decree and order.

Thereafter, and on the twenty-ninth day of April, 1926, Mrs. Blair brought this action against Guarantee Title Com-

pany, I. H. Wright, A. E. Cronin and Victor Bellotti, and alleged in her complaint in considerable detail the facts we have enumerated above, by which she claims she was defrauded of her equity in the Long Beach property. She also alleged a conspiracy on the part of Cronin, Wright and the Guarantee Title Company to defraud her of her property.

Mrs. Blair died before this action was tried in the court below, and the respondents, executors of her last will and testament were, by order of the Superior Court, substituted as parties plaintiff in her place and stead. Before her death her deposition was taken and was used at the trial of the action.

The case was tried before the court sitting with a jury, and a verdict was rendered in favor of the plaintiffs and against the defendants Guarantee Title Company, I. H. Wright and A. E. Cronin, for the sum of $1750, as above stated. The action was dismissed as to the defendant Bellotti. Cronin has not appealed.

The appellants first contend that this action abated by the death of Mrs. Blair. There is no merit in this contention. This action is for the recovery of the value of Mrs. Blair's equity in the house and lot in Long Beach, which she claimed was obtained from her by the false and fraudulent representations of defendants. All the cases cited and relied upon by appellants in support of their contention that the action abated by her death, deal with torts —none with contracts, *and affect the person only and not the estate.* In the case at bar, *the thing in action arises out of the violation of a right of property* which, by the express language of section 954 of the Civil Code, *passes to the personal representatives of the deceased,* for that section provides: "A thing in action arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner. Upon the death of the owner, it passes to his personal representatives," and it necessarily follows that the thing in action would pass to the legal representatives of the plaintiff upon her death. (*Vragnizan* v. *Savings Union etc. Co.,* 31 Cal. App. 713 [161 Pac. 507]; *Henderson* v. *Henshall,* 54 Fed. 320 [4 C. C. A. 357]; 1 Cal. Jur. 68–70.)

In Pomeroy's Remedies and Remedial Rights, section 147, it is said: "It is now the general American doctrine that

all causes of action arising from torts to property, real or personal—injuries to the estate by which its value is diminished—do survive and go to the administrator or executor as assets in his hands.''

Appellant next contends that the evidence is insufficient to justify the verdict of the jury. We are unable to agree with this contention. When a verdict is attacked for insufficiency of the evidence, our power begins and ends with the inquiry whether there is substantial evidence, contradicted or uncontradicted, which in and of itself will support the conclusion reached by the jury. If, on any material point, the testimony is in conflict it must be assumed that the jury resolved the conflict in favor of the prevailing party. (*Treadwell* v. *Nickel,* 194 Cal. 243–260 [228 Pac. 25]; *Gjurich* v. *Fieg,* 164 Cal. 429–431 [Ann. Cas. 1916B, 111, 129 Pac. 464]; *Wilbur* v. *Wilbur,* 197 Cal. 1 [239 Pac. 332].)

We have set forth enough of the record to show that the verdict has substantial support in the evidence. It is true that the evidence shows that Cronin was the instigator and prime mover in this diabolical scheme to defraud Mrs. Blair of her property, but it is equally true, as shown by the evidence, that Wright, by concealing from Mrs. Blair, from time to time, the true condition of the escrow in his hands, and making false statements to her, thereby aided and abetted Cronin in carrying out his fraudulent scheme to rob Mrs. Blair of her property. It is idle to contend that Wright did not knowingly and actively participate in the fraudulent scheme of Cronin's. If Wright was innocent of any wrongdoing, then why did he as escrow officer of the Guarantee Title Company accept from Cronin a forged escrow agreement and open a pretended escrow with his title company? Why did he not require Cronin to deposit with him the Blair and Butterfield deeds, as contemplated by the escrow agreement? Why did he not tell Mrs. Blair, before Cronin had sold her property to an innocent purchaser, that her deed was not in escrow and that Butterfield had not agreed to the exchange and knew nothing of the transaction? Why did he tell Mrs. Blair ''that the Butterfield deed had been sent to North Dakota for recordation and as soon as it was returned the exchange would be finally completed,'' when he knew that Butterfield had

never executed such a deed and that the whole proposed exchange was fictitious and a fraudulent scheme of Cronin's to obtain title to her Long Beach property? If Wright had told her the facts on her first or second visit to his office, she could no doubt have recovered her property from Cronin, because she inquired of Wright concerning the condition of the exchange *before* Cronin conveyed her property to an innocent purchaser. Can it be said, from the acts and conduct of Wright, that he was wholly innocent of any wrongdoing? Certainly not, and it is the height of absurdity to make such a claim. Wright's own admissions are sufficient to show his participation in the fraudulent scheme of Cronin. The evidence is also sufficient to support a judgment against Wright based upon deceit. (Sec. 1710, Civ. Code.)

Appellants argue that respondents have wholly failed to prove that a conspiracy existed between Cronin, Bellotti and Wright to obtain the deed from Mrs. Blair and defraud her of her equity in the Long Beach property. Conceding, for the sake of argument, that this claim is true, it does not defeat plaintiffs' action. It is wholly unnecessary to establish such a conspiracy, because the gist of the action is the *injury done to Mrs. Blair by the fraudulent and wrongful acts of Cronin, Wright and Bellotti, and this injury is actionable, whether it is the result of conspiracy or not.* The allegations of a conspiracy are immaterial and need not be proved. *Mrs. Blair is entitled to relief for the injury done her from such of the defendants as can be shown to have participated or co-operated in doing her the wrong.* (*More* v. *Finger*, 128 Cal. 319 [60 Pac. 933]; *Herron* v. *Hughes*, 25 Cal. 555; *Nevin* v. *Gary*, 12 Cal. App. 1 [106 Pac. 422]; *Revert* v. *Hesse*, 184 Cal. 295 [193 Pac. 943]; *Bowman* v. *Wohlke*, 166 Cal. 121 [Ann. Cas. 1915B, 1011, 135 Pac. 37]; 5 Cal. Jur. 528; *Mox Incorporated* v. *Woods*, 202 Cal. 675–678 [262 Pac. 302].)

Appellants next contend that the verdict of the jury is against the law and the instructions. A careful reading of the instructions satisfies us that they are somewhat conflicting, and that some of them were instructions on questions of fact and not of law, but we fail to see how these instructions could have operated injuriously against the appellants. The instructions tended to prejudice the rights

of respondents, rather than those of appellants. The instructions, taken as a whole, were far more favorable to the appellants than to the respondents.

If the jury, as appellants contend, disregarded the instructions appellants refer to, still this alone does not constitute grounds for a reversal, for a jury may disregard erroneous or conflicting instructions. (*Kelley-Clarke Co.* v. *Leslie,* 61 Cal. App. 566 [215 Pac. 699, 703]; *Dennison* v. *Chapman,* 105 Cal. 447, 448 [39 Pac. 61]; 14 R. C. L., sec. 74, pp. 815, 816; *Treadwell* v. *Nickel, supra.*)

In *Kelley-Clarke Co.* v. *Leslie, supra,* the court said: "The jury either disregarded or misunderstood the instructions of the court. The verdict was in favor of plaintiff and against defendants for the amount sued for. This presents an interesting, but by no means novel, question. It has been repeatedly held that 'a conflict in instructions which could not operate injuriously to appellant is not ground for reversal.' . . . It is only when an erroneous instruction has resulted in prejudicing the rights of the complaining party that the judgment will be reversed, and it is the general rule that such action will not be taken by the appellate court for error in giving or refusing to give instructions if the verdict is manifestly right. . . . Mr. Thompson, in his work on Trials, section 2431, says that instructions faulty or technically erroneous will not work a reversal of the judgment if the jury are not misled or if as a whole the case was fairly presented to them—and especially if their verdict is obviously correct."

We are not called upon to put a strained construction upon the trial court's charge to upset the verdict and judgment in the instant case, which is so manifestly just. (*Wright* v. *Foreman,* 86 Cal. App. 595 [261 Pac. 481].)

Appellants next complain that the court erred in failing to instruct upon a material issue. This contention is based upon these facts: Appellants, for a further and separate defense to the complaint, plead that by reason of the foreclosure proceedings in the case of *Brumwell et al.* v. *Helen Wood Blair, A. E. Cronin et al.,* plaintiff, Helen Wood Blair, was estopped from claiming any right, title or interest in the Long Beach property, or from claiming any damages from appellant Guarantee Title Company on any of the grounds stated in her complaint.

■ There are two complete answers to this contention: First, if appellants believed themselves entitled to a specific instruction embodying this particular special defense, it was their duty to request the court to give such an instruction. Having failed to request such an instruction, they cannot now be heard to complain. (*Carbaugh* v. *White Bus Line*, 51 Cal. App. 6 [195 Pac. 1066]; *Gomez* v. *Scanlan*, 155 Cal. 532 [102 Pac. 12]; *Treadwell* v. *Nickel, supra; Lahti* v. *McMenamin*, 204 Cal. 415 [268 Pac. 644]; *Johnson* v. *Pearson*, 100 Cal. App. 503 [280 Pac. 394].) ■ Second, said foreclosure action was instituted October 7, 1925, four months after the deed to the property had been obtained from Mrs. Blair by Cronin, and three months after Cronin had conveyed the property into the hands of an innocent purchaser. Under these circumstances, the decree of foreclosure could avail appellants nothing in this case, and no defense could be predicated thereon. Therefore, the court was not called upon to instruct the jury on matters that constituted no defense to the action.

■ Appellants also contend that the court erred in admitting in evidence the testimony of I. H. Wright, and in support of this contention state: "It has already been shown that the offense in obtaining the deed was committed on the 16th day of June, 1925, and that the escrow proceedings were opened on the 18th day of June, 1925. The offense was completed on the 16th day of June, 1925. Mr. Wright is named as a co-conspirator, but the rule is that after the completion of the offense the acts and declaration of a co-conspirator are not admissible for any purpose. This would bar the letter that Mr. Wright wrote to Helen Wood Blair."

We cannot agree with this argument. *The offense was not completed on the sixteenth day of June, 1925, as appellants suggest, but it covered the period from that date to the date of the transfer of the property by Cronin to the innocent purchaser, which occurred on July 23, 1925.* During this period, the evidence shows that Wright, by his fraud and deceit, lulled Mrs. Blair into false security and inactivity until *it was too late to recover her property from Cronin.* Wright's acts and conduct made it possible for Cronin to get away with Mrs. Blair's property, without her discovering what was going on. Under these facts, we think the evidence was properly admitted.

Appellant Guarantee Title Company contends that it is not liable for the acts and conduct of Wright for two reasons: First, because there was no proof that either Wright or the Guarantee Title Company received or kept any of the proceeds from the transfer of Mrs. Blair's property; second, there is no evidence to show that said acts were within the scope of the authority of the agent, or that the Guarantee Title Company ratified the acts of its agent, Wright.

Neither of these contentions can be sustained. The law is well settled that those who aid in the commission of a wrongful act by another are liable for the resulting damages, although they expected no benefits from the wrongful act and, in fact, received none. (*Brumley* v. *Speedway etc. Co.*, 138 Tenn. 534 [198 S. W. 775]; *Breedlove* v. *Bundy*, 96 Ind. 319; *Felsenthal* v. *Thieben*, 23 Ill. App. 569; *Revert* v. *Hesse, supra; Mox Incorporated* v. *Woods, supra.*)

The evidence is undisputed that Wright was the duly authorized escrow officer and clerk of said Guarantee Title Company and had power and authority to handle all escrow transactions for said title company. It is also clear from the evidence that Wright was acting within the line of his known powers—that is, he was handling for his company what purported to be an escrow transaction, and any loss arising from his dishonesty, when acting within the apparent scope of his agency, should be borne by the title company, *because it enabled him to assist Cronin in perpetrating the fraud upon Mrs. Blair, rather than by Mrs. Blair, who innocently suffered the loss of her property by the fraud of Cronin, aided and assisted by the fraud and deceit of Wright.* This principle is sustained by a long line of authorities, among them being *Bank of Palo Alto* v. *Pacific Postal Tel. Cable Co.*, 103 Fed. 841; *National Bank of San Mateo* v. *Whitney*, 181 Cal. 202, 205, 206 [8 A. L. R. 298, 183 Pac. 789].

The Guarantee Title Company would be responsible as principal for all the actual damage caused by the fraudulent acts of its agent, Wright, committed in the performance of his official duties as escrow officer. (*Wade* v. *Thayer*, 40 Cal. 578; *Turner* v. *North Beach & M. R. R. Co.*, 34 Cal. 594, 599; *Mendelsohn & Coleman* v. *Anaheim Lighter Co.*, 40 Cal. 657; *Otis Elevator Co.* v. *First National Bank*, 163

Cal. 31 [41 L. R. A. (N. S.) 529, 124 Pac. 704]; *Muehle-bach* v. *Paso Robles S. Hotel,* 65 Cal. App. 634 [225 Pac. 19]; sec. 2338, Civ. Code; *Johnson* v. *Monson,* 183 Cal. 149 [190 Pac. 635].)

We deem a further discussion of this case entirely unnecessary. Looking at the substance of this transaction in its true light, unclouded by the earnest but highly technical arguments of appellants' counsel, we find that Cronin was not only the trusted confidant and friend, but the agent and business adviser, of Mrs. Blair. His relation to her was fiduciary, and every rule of law and honesty commanded of him the utmost fairness and good faith in all his dealings with her. Instead of living up to the trust and confidence reposed in him, he procured title to Mrs. Blair's property by means of chicanery and various varieties of fraud and deceit. Then we find Wright, who was also the confidential and trusted employee and agent of the title company, whom the public had a right to believe was honest and trustworthy, aiding and assisting Cronin in defrauding Mrs. Blair of her property, and by his deceit and fraud lulling her into false security until the title to her property had passed into the hands of an innocent purchaser. The law abhors fraud in all its guises and renders abortive its shrewdest intrigues and machinations.

We find no reason for disturbing the righteous verdict and judgment of the jury.

Judgment affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.