[Civ. No. 4428. Fourth Dist. Dec. 2, 1952.]

PEGGY GENE EVANS, Respondent, v. RANCHO ROYALE HOTEL COMPANY (a Corporation) et al., Appellants.

Thompson & Colgate for Appellants.

Sarau, Adams, Neblett & Sarau for Respondent.

MUSSELL, J.—This is an action to recover damages alleged to have been suffered by plaintiff in relying upon fraudulent representations made to her by defendants in connection with the sale of real property in Palm Springs. The representations

were that one of the lots involved (Lot 38) could be improved with multiple dwellings and used and occupied for income purposes, when the same was, in fact, restricted to single family dwellings by deed restrictions imposed upon it by defendants. The damages claimed by plaintiff consisted of the sum of $2,500 expended by her in obtaining the preparation of plans and specifications for seven multiple dwellings to be erected upon the property; $140 paid as a deposit on kitchen units to be installed on the premises; and $240 paid for rental of living quarters.

The trial court rendered judgment awarding plaintiff the damages claimed, with interest.

The sufficiency of the evidence to sustain the court's findings as to the representations made and damages suffered is not here questioned. The grounds relied upon by defendants for reversal of the judgment are that the parties mutually rescinded the contract of sale and that plaintiff was not thereafter in a position to recover damages by reason of the representations made by defendants.

On or about May 26, 1948, plaintiff and her husband advised a real estate agent in Palm Springs that they were interested in purchasing land that would be improved with apartment income property. The lots involved were shown to plaintiff and she was advised by the agent that Lot 38 was available for improvement with multiple dwelling units. Plaintiff and her husband then had a conference with defendant Robert Levin regarding the possibility of improving Lot 38 with multiple dwelling units and Levin was advised that plaintiff so intended to improve the property. Plaintiff was not then informed that deed restrictions had been placed on the property by defendant owners in 1946, which restrictions, among other things, classified Lot 38 as R-1 property upon which only a single family dwelling could be erected.

Two days after this conference plaintiff made an offer for Lot 38, and Lot 37 adjoining, which was accepted by defendants, and on June 1st the defendant corporation executed a written contract with plaintiff for the sale of the two lots for the sum of $13,750 and plaintiff paid the agent $1,375 on the purchase price. On the following day an escrow was opened and plaintiff deposited in escrow the balance of the purchase price and her share of the expenses, totaling $12,420.

On June 2d plaintiff engaged a designer to prepare plans and specifications to be used by plaintiff in the construction of plaintiff's proposed improvements on the property. Plain-

tiff also entered into an agreement with a corporation for the purchase of seven kitchen units and rented an apartment in which to live during the construction.

On June 11th the bank, as escrow holder, received a preliminary title report on Lots 37 and 38 wherein reference was made to the deed restrictions on Lot 38 and plaintiff then learned for the first time of the restrictions. A conference was then had with defendant Samuel Levin in which Levin stated to plaintiff that Robert Levin had been delegated to secure the signatures necessary to have the restrictions removed but that his work had not been completed. About 30 days later plaintiff's husband again contacted Samuel Levin in regard to the removal of the restrictions. At this meeting Levin was informed by plaintiff's husband that because defendants had not been able to remove the restrictions, plaintiff could not proceed with the transaction in time to complete the improvements for the 1948-1949 season and that if he could not be given a definite time, he did not see how plaintiff could proceed. Levin stated that if plaintiff could not wait until the signatures were secured, the only alternative was to cancel the transaction. An appointment was then made to meet at the bank the following morning to cancel the escrow, at which time cancellation instructions were prepared and signed by Samuel Levin who then gave plaintiff's husband a check for $1,375. The check and the instructions were taken to plaintiff, who signed the instructions and endorsed the check. The cancellation instructions were then returned to the bank where plaintiff's husband received a cashier's check for $12,420, theretofore paid in escrow by plaintiff.

There was no discussion by the parties as to the items of damages claimed in this action until the cancellation agreement was executed and plaintiff's money was returned to her.

The cancellation instructions were as follows:

"Trust Department
Bank of America
National Trust and Savings Association
Escrow No. 950-5838
Amendment to
Escrow Instructions

"The previous instructions in this escrow No. 950-5838 are hereby modified and/or amended in the following particulars only:

"You are directed to cancel your above numbered escrow

and return all money and/or instruments to persons depositing same.

"Rancho Royale Hotel Company hands you herewith check No. 1167 payable to Peggy G. Evans in the amount of $1375.00, representing money paid outside of escrow. As an accommodation only, you are directed to deliver said check to Peggy G. Evans.

"Rancho Royale further agrees to pay all charges in connection with the cancellation, including title company charge and escrow cancellation fee. You are authorized to charge the commercial account of Rancho Royale Hotel Company for said charges.

"Peggy Gene Evans hereby acknowledges receipt of Cashier's Check No. 9509822 in the amount of $12,420.00, together with check of Rancho Royale Hotel Company in the amount of $1375.00.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Rancho Royale Hotel Company,

By s/ Samuel H. Levin—Pres.
    s/ Peggy Gene Evans."

Defendants' point "that the parties mutually rescinded the contract and having done so, the matter ended" is well taken. In *Hjorth* v. *Bernstein*, 44 Cal.App.2d 561, 564 [112 P.2. 643], this court held that a person claiming to be defrauded by false representation has a choice of two inconsistent remedies, to wit, he may elect to rescind the contract; or, to affirm it and claim damages. He cannot do both. The right to damages exists unless and until the transaction is effectually disaffirmed. (This holding was approved in *LeClercq* v. *Michael*, 88 Cal.App.2d 700, 703 [199 P.2d 343].)

In *Karapetian* v. *Carolan*, 83 Cal.App.2d 344, 347 [188 P.2d 809, 1 A.L.R.2d 1075], it is said:

"There can be no doubt that the remedies of rescission and an action for damages are inconsistent and that a completed or effectual rescission terminates the contract and bars an action for fraud. (*McCready* v. *Bullis*, 59 Cal.App. 286 [210 P. 638]; *Davis* v. *Rite-Lite Sales Co.*, 8 Cal.2d 675 [67 P.2d 1039].) The correct rule, supported by authorities is stated as follows in 6 California Jurisprudence, page 388, section 233: 'Upon the breach of a contract a party thereto may treat it as rescinded, and if he had advanced money on it, bring an action for its recovery; or he may treat the contract as still in force and maintain an action for damages for the breach,

but he cannot pursue both courses. If the facts exist which justify a rescission by one party, and he exercises his right and declares a rescission in some effectual manner, he terminates the contract, and it cannot thereafter be made the basis of an action for damages caused by breach of the covenants.''

In *Martin* v. *Butter,* 93 Cal.App.2d 562, 566 [209 P. 2d 636], it is stated, quoting from *Tompkins* v. *Davidow,* 27 Cal.App. 327, 335 [149 P. 788]:

'' ' ''There can be no question that a contract can be mutually abandoned by the parties at any stage of their performance and each of the parties released from any further obligation on account thereof; that it may be done by parol, and the fact of its having been done established by evidence of the acts and declarations of the parties.'' ' '' (Citing cases.)

The plaintiff argues that she is not seeking damages for breach of contract nor is she seeking to recover any payment to appellants pursuant to a contract, but that she merely seeks restoration to her original position by reason of the present tort action wherein she seeks damages in the amount expended by her in reliance upon the fraudulent representations made by the defendants; that the action is not upon the contract but is a collateral tort action. We cannot agree with this contention.

Plaintiff's action for fraud arises out of and is based upon the breach of the contract of sale by the defendants and since the contract was canceled by mutual agreement, plaintiff was thereafter precluded from recovering damages for its breach. The cancellation constituted a final settlement, leaving no room for further claims.

It is argued that there was no meeting of the minds or agreement to waive damages claimed herein at the time the cancellation agreement was executed. The record shows that this matter was not discussed by the parties and it is to be presumed that the written agreement contained all the terms upon which the parties had agreed for rescission and that the contract could not be varied by parol. The inference is that there was a mutual waiver of all claims for damages and that it was a complete settlement of their controversy. In this connection it may be noted that the plaintiff, in addition to accepting the moneys paid by her on the purchase price of the property, also received part of the expenses in connection with the transaction. As was said in *Winton* v. *Spring,* 18 Cal. 451, 454, 455:

''The agreement of cancellation evidently was intended to

effect a complete settlement in regard to the subject; it discharges the parties from all covenants and agreements in the original contract, and provides for a surrender of the premises. . . . It is much more probable that when parties come to an arrangement of a business matter, they settle all the terms of the contract, than that they leave them unadjusted. ▇ The word 'cancel,' applied to the agreement, under the circumstances, means no more than 'doing away with' an existing agreement upon the terms and with the consequences mentioned in the writing. What is not said, is excluded; and whatever was meant to be obligatory was expressed.''

▇ In *Gardner* v. *Shreve*, 89 Cal.App.2d 804, 808 [202 P.2d 322], it is said:

''Normally any agreement to rescind or modify an existing bilateral relation finds sufficient consideration in the prior rights of the parties which are surrendered. (Rest., Contracts, § 406, com. a; VI Williston on Contracts (rev. ed.), § 1826; *Sistrom* v. *Anderson*, 51 Cal.App.2d 213, 219 [124 P.2d 372].)''

The record herein shows that the parties cancelled the agreement for sale and purchase of the real estate involved upon terms acceptable to both of them. This cancellation was consummated and the contract in that regard was fully carried out. Plaintiff was thereafter precluded from recovery of damages such as are herein sought.

Judgment reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied December 19, 1952, and respondent's petition for a hearing by the Supreme Court was denied January 22, 1953. Edmonds, J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.