[Civ. No. 15928.   First Dist., Div. One.   Oct. 1, 1954.]

NOEL S. ALTON, Respondent, v. R. A. ROGERS, Appellant.

Anthony S. Devoto and John Wynne Herron for Appellant.

Charles W. Robertson and Edward A. Hammer for Respondent.

PETERS, P. J.—In February of 1951 Noel S. Alton brought this action against R. A. Rogers, an attorney at law, and William P. Devou. On motion of plaintiff, Devou was dismissed from the action at the conclusion of the trial.\* The complaint stated two causes of action based on the same transactions, the first, an equitable action for breach of trust and an accounting, and the second, a legal action for damages for fraud. The trial court, over the objections of defendant's counsel, ordered the legal action tried before a jury. The jury brought in a verdict against defendant for $6,939 compensatory and $15,000 punitive damages. Judgment on this verdict, totalling $21,939, was entered. Later, based on the same record, the court filed its findings of fact and conclusions of law in the equitable action, awarding plaintiff $6,939 damages against defendant. A second judgment in that amount was entered. This judgment contained a provision that any sums paid in satisfaction of the second judgment should constitute a *pro tanto* satisfaction of the first judgment. Defendant separately appeals from the two judgments.

Defendant was represented by counsel prior to trial. That counsel, however, on instructions from defendant, refused to participate in the trial, although, on order of the court, such

---

\*Hereafter the term ''defendant'' will be used to designate R. A. Rogers.

counsel remained in the courtroom during the trial. Defendant was not physically present at the trial. Thus, the facts contained in the record were all produced by plaintiff, and such facts are wholly uncontradicted by any evidence produced by defendant.*

The record amply supports the implied findings of fraud and the express findings of breach of trust. The story opens in 1941. In that year the plaintiff was 21 years of age, was attending the University of California, and was a fraternity brother of defendant's son, through whom he met defendant. Plaintiff had just received an inheritance of about $19,000 and intended to invest it in a trucking operation. To this end he retained defendant as his attorney to advise him and to handle the legal details of the transaction. Defendant investigated the proposed transaction, advised plaintiff not to participate in it because, so he said, the risk was too great, told plaintiff that in his legal business he frequently ran across safe investment opportunities, and would get in touch with plaintiff when such an opportunity arose. Plaintiff paid defendant a legal fee for services in getting him out of the trucking deal. A short time later defendant telephoned plaintiff and told him that he had an excellent deal in which plaintiff could safely invest his money; that he had an elderly retired client named Devou who was to share in a large estate in Ohio, but who was required to post a bond in the probate proceeding and had no money to do so; that if plaintiff would lend the money to Devou for this purpose "it would be a very good investment since it was secured by several hundred thousand dollars worth of real estate in Cincinnatti"; and that if plaintiff would make the loan he, the defendant, would have a promissory note drawn providing for 7 per cent interest. Plaintiff was told that the entire transaction would probably be settled in seven or eight months, but that the note would be drawn for a full year. On these assurances, in August of 1941, plaintiff gave to defendant a check for $1,900, and again defendant promised that a 7 per cent note would be signed. Defendant wanted more money, but $1,900 was all the cash plaintiff then had available. Plaintiff suggested that his uncle might be interested in making such a safe investment, but defendant dissuaded him from communicating with his uncle, suggesting that plaintiff should cash some war bonds and lend the pro-

---

*Devou was present at the trial, testified, and was represented by counsel. This counsel participated in the trial, until, at the close of the case, plaintiff's motion to dismiss against Devou was granted.

ceeds to Devou. The plaintiff secured six war bonds, cashed them at defendant's bank, and handed the proceeds, $2,250, to defendant. No receipt was given. Immediately after this transaction plaintiff accompanied defendant to the latter's office where he was introduced to Devou. Except for acknowledging the introduction Devou remained silent during the interview. Defendant showed plaintiff an unsigned promissory note and told plaintiff that he would have a new note prepared covering both loans providing for 7 per cent interest. Defendant also told plaintiff that since plaintiff was about to enter the military service it would be best if he, the defendant, kept the note so that it would be available when the settlement was made. Plaintiff never saw Devou again until the time of trial.

On October 29, 1941, defendant delivered to plaintiff a cashier's check for $26.25 representing an interest payment on the loan. Between then and March of 1942, when plaintiff entered the military service, about three other interest payments in substantially the same amount as the first one, were paid by defendant to plaintiff in cash. After March of 1942 no word was received from defendant until December 19, 1942, when defendant, after several prior requests for information had been ignored, sent to the plaintiff a cashier's check, purchased by defendant, for $150. The forwarding letter accompanying this check stated that defendant had just received the money for the interest from Devou, and that defendant had arranged with Devou that, after February 1, 1943, all future interest payments would be sent to plaintiff directly from Devou.* The forwarding letter also represented that defendant was going to prepare and have signed a "new" note payable July 1, 1943.† Neither this promised note nor any further interest was then received. Thereafter, numerous requests were made by plaintiff by letter or by long distance telephone calls from various army camps asking for his interest and for the promised note. Defendant's answers to these requests were of a stalling nature and uniformly optimistic as to when plaintiff would receive his money. In October of 1943, after repeated requests, defendant telegraphed plaintiff that he would send the promised Devou note by air mail, and

---

*Devou denied making any payments on plaintiff's loan, denied that defendant had arranged that Devou should make such payments, denied knowing any of the details of the loan between plaintiff and defendant, and denied receiving any of the money advanced by the plaintiff.

†Plaintiff had never seen or received the note promised for the original loan, and there is no evidence that such a note was ever prepared.

that the full principal and interest on the loan would be repaid by March 26, 1944. Neither the note nor any payments were then received. Throughout 1944 and until the middle of 1945 plaintiff was transferred from one army camp to another, or was overseas, and did not personally communicate with defendant, but his wife in San Francisco made several telephone calls to defendant. On each occasion defendant assured the wife that everything was fine concerning the loan. When plaintiff returned to a California base in May of 1945 he telephoned defendant on several occasions, and was told that mere technicalities were holding up the settlement of the probate proceeding, but that everything was in good shape and was being taken care of by defendant. Plaintiff then was again sent overseas. Plaintiff's wife made repeated inquiries of defendant in the fall and winter of 1945. On one of these occasions defendant told her that he had two buyers for plaintiff's note and could sell it if she had a power of attorney from her husband to sign the note. She replied that she had such a power of attorney, whereupon defendant said that her husband's personal signature was necessary and without it the sale could not be consummated.

Plaintiff returned to the United States near the end of 1945 and called on defendant. He was assured that the probate matter would be cleared up in the very near future. In 1946, plaintiff, now discharged from the army, was living in Sacramento. Frequent telephone calls to defendant were answered by excuses. After considerable prodding, in December of 1946 appellant told plaintiff that the probate proceeding had been settled and that he was sending a $1,000 check at once, and that the balance owed would be paid off in $1,000 installments starting in two or three weeks. Plaintiff did, in fact, receive a $1,000 cashier's check which had been purchased by defendant. No further payments, as promised, were received. Attempts to reach defendant by telephone were unsuccessful. In April of 1947 plaintiff moved to San Francisco, and made several calls upon defendant, each time being put off with the excuse that some slight technical difficulty was holding up the payments. After repeated requests, on July 23, 1948, defendant handed to plaintiff a one-year promissory note, purportedly signed by Devou, in the amount of $5,339.44, which, according to defendant's computations, included all sums of interest and principal then due, less payments made. At that time defendant stated that some disagreement had arisen between Devou and his sister that would delay settlement some

five or six weeks. Plaintiff then moved to Los Angeles. Hearing nothing from defendant, in October, 1948, plaintiff telephoned and was told that the matter would be settled by November. In December, 1948, plaintiff again telephoned defendant and was told that Devou was East, would return about the middle of January, 1949, and that the case would then be settled. Hearing nothing from defendant, plaintiff, in February of 1949, sent his wife to San Francisco to find out what was causing the delay. Defendant told the wife, in response to her request, that he did not know Devou's address, that he would have Devou get in touch with plaintiff, that the records she wanted were in his home safe, and that he was taking care of them. Plaintiff was disturbed by these tactics and, under date of March 16, 1949, wrote to defendant stating that he was getting suspicious because of defendant's stalling tactics, and felt that he was compelled to use legal means to collect the debt. Defendant immediately telephoned to plaintiff, chided him for his impatience, gave him Devou's address, and told plaintiff that he was so sorry for the delay that "he personally would pay the *full* amount of the original principal if Devou didn't by November, 1949." (Italics added.) He agreed to confirm this promise in writing. He failed to do so. After considerable prodding from plaintiff, defendant did send to plaintiff an unsigned letter in which he agreed that if Devou did not pay the entire amount due by November 27, 1949, he would pay the *balance* of the original principal of $1,850, which he computed by considering the original loan as being for $3,000,* and deducting the $1,000 and $150 payments therefrom. Plaintiff protested that while he had no records of the original transactions he was sure they totalled more than $3,000, and claimed that some of the payments made to him were on interest and not principal. He received no response to this letter of protest. In the meantime plaintiff wrote to Devou and received no response. In November of 1949 plaintiff wrote to defendant reminding him of his promise to pay at least $1,850 if Devou defaulted. Defendant responded that the case would be settled by December 10, 1949. On that date plaintiff telephoned to defendant, explained that he had lost his business, was broke, and needed money. Defendant replied that he too was "completely broke," that he had been forced to borrow $1,700 on his Cadillac, and that he had only enough money left to get back to Ohio and settle the

---

*The loan was, in fact, in the sum of $4,150

probate proceeding. He told plaintiff that he would send him $200, and that such sum was all that would be received until the case was settled. The $200 was received by plaintiff the next day. This was the last communication received by plaintiff from defendant.

It next appears that early in 1950 a $15,000 payment was made to Devou in the Ohio litigation. Devou testified that he knew nothing of this payment. Apparently $5,000 of this sum was divided between the Ohio attorneys and defendant as fees. At any rate, in February, 1950, the Ohio attorneys sent to defendant a check for $10,000. Appellant converted this sum into five cashier's checks as follows:

| | |
|---|---|
| Elizabeth Venning | $3,000 |
| Mary Kean | $2,000 |
| Noel Alton | $1,000 |
| R. A. Rogers | $3,789.64 |
| William P. Devou | $ 210.36 |

Devou signed an instrument agreeing to the above distribution in which he stated it was in full settlement of all sums due from Devou to defendant. Devou never received his check for $210.36, nor did plaintiff ever receive the $1,000 cashier's check made out in his name. The record shows that defendant, as original purchaser of that cashier's check, cashed it himself.* This action was filed February 2, 1951.

Defendant asserts that the implied findings of fraud and express findings of breach of trust are not supported. The facts speak for themselves. Contrary to defendant's contention the evidence shows that the relationship of attorney and client existed between defendant and plaintiff before and at the time the loan was made. Although the loan was to be made to Devou for a specific purpose, the money was not used for that purpose. The evidence is ample to support the conclusion that the money was used by defendant to generally finance the litigation. Many fraudulent representations were made, irrespective of where the money went or who was to repay it. ■ The wantonness and falseness of defendant's misrepresentations and conduct as shown by the record amply

---

*Devou testified that he was not informed of the $15,000 settlement, but did know of the $10,000 payment, being informed by defendant that that sum was needed to pay sums borrowed. There is some question about the payments made to Venning and Kean. Although they testified that they loaned various sums to defendant for Devou, their testimony was very vague and uncertain, and raises a doubt as to whether such loans were ever made.

support an award of punitive damages. (Civ. Code, § 3294.) The amount of that award is not seriously challenged on these appeals.

Admittedly, the award of $6,939 contains an error in computation. Defendant himself determined that as of July 23, 1948, the amount due, plus interest, was $5,339.44. Extending the 7 per cent interest to December 1, 1952, the date of the trial, adds an additional $1,627.93, from which must be deducted the $200 paid in December, 1949. This leaves the balance as $6,767.37, which makes the $6,939 award excessive in the amount of $171.63. This was an obvious error in calculations which can and should be corrected by a modification of the judgment. (*Durbin* v. *Hillman*, 50 Cal.App. 377 [195 P. 274].)

One of the main contentions of defendant centers around the assertion that it was prejudicial error to compel defendant to go to trial before a jury before the court had determined the equitable issues presented in the first cause of action. There is no merit in this claim.

The facts upon which this contention is based are as follows: Defendant was originally represented by counsel, and such an attorney filed an answer on his behalf. Thereafter, defendant elected to represent himself until October of 1952 when services of present counsel were secured. On October 28, 1952, the trial court entered its order ''pursuant to written stipulation'' of the parties setting the cause for ''trial by the Court, sitting with a jury'' for November 25, 1952. A week before that date defendant's counsel moved to drop the cause from the calendar on the ground that it was not one in which the plaintiff was entitled to a jury trial as a matter of right. The trial court denied the motion and assigned the cause for jury trial on December 1, 1952. On that date defendant's counsel renewed the motion, requested that the equitable issue be tried first, and, in any event, requested a further continuance because his client, the defendant, had been unexpectedly called out of town. After it developed that several continuances had already been granted, that defendant on November 25, 1952, had been definitely informed that no further continuances after December 1, 1952, would be granted, and that plaintiff, who had been recalled to army service, had received a special short leave to appear at the trial, the trial court denied the motions stating that the cause should proceed to trial before a jury and that the court, on the same evidence, would dispose of the equitable issues. There-

upon, counsel for defendant requested permission to withdraw from the case, stating that he had been instructed by his client to make such request if the motions above discussed were denied. The trial court refused to grant the request and ordered counsel to continue to represent defendant. Counsel stated that he would remain in the courtroom, but would not participate in the trial. Thereafter, the trial proceeded, defendant not appearing, and his counsel refusing to participate. As already pointed out, the jury returned verdicts of $6,939 compensatory damages and $15,000 punitive damages against defendant. Judgment on these verdicts, totalling $21,939 was entered by the clerk December 4, 1952. The motion of defendant for a new trial was denied by operation of law. Defendant filed a notice of appeal February 20, 1953.

In the meantime, on January 16, 1953, the court filed its findings and conclusions in the equitable action by which it awarded plaintiff $6,939. A second judgment in that amount was entered, from which defendant appealed on April 17, 1953.

Defendant contends that the first, or equitable cause of action should have been tried and determined first, and that only the remaining legal issues, if any, should then have been submitted to the jury. This, so it is urged, was error of a most serious nature, because, had this been done, no legal issues for a determination by the jury would have remained in the case.

█ It is, of course, the law that when a complaint contains a legal count and an equitable one, the plaintiff is entitled to a jury trial upon the issues raised in the legal count. (*Robinson* v. *Puls*, 28 Cal.2d 664 [171 P.2d 430].) There is no dispute that the second cause of action for damages for fraud was legal in nature, and that plaintiff was entitled to a jury trial on the issues there raised. But, says defendant, the equitable issues presented on the first cause of action should have been determined first. █ Undoubtedly it has been held that normally it is the better practice in such situations to determine the equitable issues before the remaining legal ones are submitted to a jury. (*Connell* v. *Bowes*, 19 Cal.2d 870 [122 P.2d 456]; *Thomson* v. *Thomson*, 7 Cal.2d 671 [62 P.2d 358, 117 A.L.R. 1]; *Peterson* v. *Peterson*, 74 Cal.App.2d 312 [168 P.2d 474]; *Angus* v. *Craven*, 132 Cal. 691 [64 P. 1091].) But this is not jurisdictional. The trial court has power over the order of proof. █ Here the trial was had before the court and jury. In its instructions to the jury the trial judge carefully distinguished between the legal and equitable issues, and took from the jury all of the issues involved in the equitable

cause of action. After the jury had brought in its verdicts the trial court made its findings and conclusions on the equitable issues. This could and did result in no prejudice to defendant.

A more serious question revolves around the fact that two separate judgments were entered. There can, of course, be but one judgment in an action. Although two judgments were here entered, an examination of the record discloses that, in fact, but one effective judgment was entered. The jury verdict on the legal issues was rendered December 3, 1952. The clerk, apparently thinking he was compelled to do so by section 664 of the Code of Civil Procedure, entered judgment on this verdict on December 4, 1952. On January 16, 1953, the trial court made its findings of fact and conclusions of law and entered judgment in the equitable action. The second judgment contained the following provision:

"It is further ordered, adjudged and decreed that any sums paid toward the satisfaction of this judgment shall be credited in a like amount toward the satisfaction of the judgment herein entered on the 4th day of December, 1952, on the verdict of the jury in the Second Cause of Action of the above entitled action, and that full satisfaction of the judgment herein entered on the verdict of the jury, as aforesaid, shall constitute a full satisfaction of this judgment."

Thus, the trial court attempted, somewhat awkwardly it is true, to incorporate the so-called first judgment into the second judgment. Had this expressly been done there can be but little doubt that, in legal effect, the first judgment would be void, but such incorporation would have resulted in there being but one effective judgment, the second, which would have included the first. This was the precise situation presented in *Shapiro* v. *Equitable Life Assur. Soc.*, 76 Cal.App.2d 75 [172 P.2d 725]. In that case certain special issues were submitted to a jury, and the remaining issues to the court. After rendition of the jury verdict, on October 10, 1944, the clerk, assuming that it was his duty to do so under section 664 of the Code of Civil Procedure, entered judgment in conformity with the verdict. Findings, conclusions and judgment on the court-tried cause of action were entered on January 16, 1945. The second judgment expressly referred to the first judgment and expressly incorporated the first judgment in the second. On appeal it was contended that it was error to enter two judgments. The appellate court held that there can be, of course, but one judgment in the case, but that, under

the facts, there was but one effective judgment, the second one, and that the first one was void and should be disregarded. At page 98 the court stated: ''Where special issues which form only a portion of the controversy between the parties to the action are submitted to a jury and the remaining issues are tried by the court and findings of fact made thereon, no judgment can be entered in the case at the time the jury renders its verdict. The case has not been tried and the trial has not been concluded until the court has rendered its decision disposing of all issues submitted to it, and there is no decision until the court has passed upon the facts and drawn its conclusions thereon. [Citing cases.] Where, in an action for injunction and damages, the question of damages is submitted to a jury its verdict does not affect the equitable issues which are to be determined by the court upon findings of fact made by it. The clerk is without authority to enter a judgment on the verdict where issues of purely equitable cognizance remain which the court alone can determine and which it had not determined at the time the verdict was rendered. [Citing cases.] Section 664 of the Code of Civil Procedure is directory and it is not necessary to the validity of a judgment that it should be entered within 24 hours after the verdict is rendered. [Citing a case.] The trial of this action had not been concluded when the verdict of the jury was rendered, and the judgment entered thereon having been premature was void and of no effect. [Citing cases.] . . .

''There is but one judgment in the case, to wit, the judgment of the court which followed the findings of fact determining all issues both legal and equitable adversely to appellant, which for the reasons herein stated is affirmed. The purported appeal from the void judgment entered on the verdict of the jury is dismissed.''

In legal effect the situation in the instant case is quite similar to that in the Shapiro case. Here the trial court provided in the second and smaller judgment that satisfaction of the first and larger judgment would constitute a satisfaction of the smaller judgment. This would appear to amount to an incorporation of the first judgment into the second. Thus, although the first judgment is void, as having been prematurely entered, the second judgment, if it incorporates the first, is the sole valid and effective judgment. This must have been the intent of the trial court. In order to effectuate that intent this court possesses power to correct the oversight, if one was made. In order to do so it will be provided in the order of this court that the second judgment should be modified

to include, expressly, the first, and the first judgment should be declared void as having been prematurely entered and stricken from the record. (*Burke* v. *City & County of San Francisco*, 111 Cal.App.2d 314 [244 P.2d 708].)

■ It is next urged that, as a matter of law, both causes of action were barred by the statute of limitations or by waiver. These arguments are predicated on the contentions that fraud underlies both causes of action, and that such actions, under section 338, subdivision 4, of the Code of Civil Procedure, must be brought within three years of the discovery of the fraud. It is argued that the loan was made in 1941 with the agreement that it should be repaid within a year; that plaintiff knew in 1942 that the loan was not to be then repaid, and knew that he had not received regular interest or the promised note; that the fraud, if any, was fraud in the inception which plaintiff obviously discovered in the early 1940s; that if failing to invest the money as promised constituted a breach of trust, such breach occurred in 1941.

These arguments are obviously fallacious. They amount to contending that although defendant was the attorney for plaintiff, and that although defendant was fraudulent in 1941, plaintiff should not have been so credulous as to have believed the representations and continuing promises made by defendant thereafter, and should have discovered the fraud earlier. Such arguments do not carry conviction. ■ Moreover, in the interest of accuracy the first cause of action is not concerned with fraud. It involves an oral, voluntary and continuing trust. This trust continued until it was repudiated by defendant, and until plaintiff learned of such repudiation. (*Kornbau* v. *Evans*, 66 Cal.App.2d 677 [152 P.2d 651]; *Mulli* v. *Mulli*, 105 Cal.App.2d 68 [232 P.2d 556]; see cases collected 25 Cal.Jur. p. 271, § 133.) ■ In view of the many reassurances given by defendant to plaintiff, the first time plaintiff knew or should have known that the trust had been repudiated was December 14, 1949, when defendant sent plaintiff $200 and unequivocally told plaintiff that the agreement would not be lived up to in that no further payments would be made until the Devou estate was settled. Thus, the action filed on February 2, 1951, was well within the statutory period, whether such period is three years as claimed by defendant, or four years as claimed by plaintiff.* While it is true that plaintiff knew that defendant was not fulfilling the promises made in

---

*A dictum in *Siem* v. *Hjelm*, 49 Cal.App.2d 148, at page 153 [121 P.2d 87], indicates that the proper period in such cases is four years.

1941, defendant's continuing reassurances and optimism, in legal effect, amounted to a renewal of the original promises. The trust, under the evidence, was a continuous one. The finding of the trial court on this issue is supported by the record and by the law.

Substantially this same reasoning is applicable to the fraud cause of action. In view of the confidential relationship that existed between the parties plaintiff was legally entitled to rely on the many reassurances of defendant that everything was all right, and this legitimately delayed the discovery of the fraud.

Defendant contends that this cause of action fails to allege the date of discovery of the fraud, an essential allegation in such cases. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958].) Defendant misinterprets the pleading. The second cause of action clearly alleges that plaintiff did not learn that his money had not been safely invested to post a bond for Devou in the probate of Devou's father's estate but was being used in a hotly contested action to construe a will and for declaratory relief until July 23, 1948, which was well within the three-year period. In view of the confidential relationship existing and clearly pleaded, this was sufficient. (*Anderson* v. *Thacher*, 76 Cal.App.2d 50 [172 P.2d 533] ; *Rutherford* v. *Rideout Bank*, 11 Cal.2d 479 [80 P.2d 978, 117 A.L.R. 383].)

The next contention is that the breach of trust count is one for rescission and to recover the trust fund with interest, while the second affirms the contract and seeks damages for fraud, it being urged that such remedies are inconsistent. It is also urged that if fraud was ever part of the first cause of action the record shows that plaintiff waived the fraud and affirmed the contract by accepting the note of July 23, 1948, by accepting defendant's promise to pay $1,850 if Devou did not pay, and by accepting the $200 payment of December 14, 1949, in part performance.

The point need not be labored that causes of action based on fraud, rescission and damages are inconsistent and require an election of remedies. (*LeClercq* v. *Michael*, 88 Cal. App.2d 700 [199 P.2d 343] ; *Evans* v. *Rancho Royale Hotel Co.*, 114 Cal.App.2d 503 [250 P.2d 283] ; *Squire's Dept. Store, Inc.* v. *Dudum*, 115 Cal.App.2d 320 [252 P.2d 418].) But the rule is not here applicable. The first cause of action is not based on fraud warranting a rescission. No rescission is here involved. The first cause of action is one for

breach of an oral trust. Such cause of action is not inconsistent with a cause of action for damages. (*Kornbau* v. *Evans,* 66 Cal.App.2d 677 [152 P.2d 651].) The evidence overwhelmingly refutes any theory of waiver. ██ Waiver of a fraud does not occur until one has full knowledge of the facts of the fraud. (*Schied* v. *Bodinson Mfg. Co.,* 79 Cal. App.2d 134 [179 P.2d 380].) Here the evidence shows that as late as July of 1948, when plaintiff accepted the note, defendant told plaintiff that Devou and his sister had reached an amicable agreement, and that a complete settlement would occur in five or six weeks. In point of actual fact the action to construe the will, the contested action in which Devou was interested, was not started until sometime in 1949. Everything that plaintiff accepted from defendant was not something outside the contract that could constitute a new consideration for a revised contract, but was something that was owing to plaintiff under the original contract.

██ Defendant seems to make some complaint that the waiver and statute of limitations issues were not presented to the jury, though raised by answer. These were affirmative defenses pleaded by defendant on which no direct or indirect evidence was introduced by defendant. Of course, no request by defendant for any instruction on the supposed issue was ever made. Under such circumstances it was not error to fail to instruct on the issues. (*Blair* v. *Guarantee Title Co., Inc.,* 103 Cal.App. 260 [284 P. 719].)

Other points raised are so unsubstantial as not to require comment.

For reasons already stated it is ordered that the first judgment of December 4, 1952, having been entered prematurely, is void and ordered stricken from the record and the purported appeal therefrom dismissed; the second judgment of January 16, 1953, is ordered modified by incorporating therein *in toto* the judgment of December 4, 1952; the verdict of December 3, 1952, and the findings, conclusions and judgment of January 16, 1953, as modified, because of an error in computations, is further modified by reducing the award of $6,939 to $6,767.37. As so modified, the judgment is affirmed. The ends of justice require that plaintiff recover costs on both appeals. It is so ordered.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 24, 1954.