Filed 6/17/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PAUL OROZCO,<br><br>    Plaintiff and Appellant;<br><br>SOLID RESTAURANT VENTURES, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WPV SAN JOSE, LLC et al.,<br><br>    Defendants and Appellants. | H044014<br>(Santa Clara County<br>Super. Ct. No. 1-13-CV-252116) |
| PAUL OROZCO et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>WPV SAN JOSE, LLC et al.,<br><br>    Defendants and Respondents. | H044062 |

Paul Orozco opened the eponymous Pauly's Famous Franks N Fries (Pauly's), a restaurant offering gourmet hot dogs, sausages, and specialty french fries, at The Plant shopping center in San Jose (the Plant). Before Orozco signed a 10-year lease for space at the Plant, he asked the leasing manager whether restaurants with competing concepts or products were being considered for the remaining unfilled leases. The leasing

manager told him no, even as she was negotiating a lease with Al's Beef, a national franchise selling hot beef sandwiches, hot dogs, and french fries. Although the leasing manager procured a fully executed lease from Al's Beef before Orozco signed his lease, she never disclosed this fact to Orozco.

Orozco signed a 10-year lease for the space at the Plant on behalf of Solid Restaurant Ventures—a limited liability company that Orozco created to operate Pauly's and which he wholly owned—with Vornado, the company that then owned the Plant. Orozco signed the lease without having learned that the Plant had also leased space to Al's Beef. Orozco also personally guaranteed Solid Restaurant Ventures' rent payments under the lease by signing a separate guaranty. The lease, which Orozco did not fully read, contained multiple provisions stating that the landlord had not made any promises to Solid Restaurant Ventures about products offered by other tenants or future tenants of the Plant.

Pauly's had a successful debut at the Plant, with lines of customers out the door and steadily increasing revenue. Approximately six months after Pauly's opened, Al's Beef opened two doors down. Pauly's business quickly declined and, within six months of the debut of Al's Beef, Pauly's at the Plant had closed.

Solid Restaurant Ventures and Orozco sued Vornado and Cole (a collection of related entities that had acquired the Plant from Vornado) for fraud. Following a trial, the jury rendered verdicts that Vornado had committed the torts of intentional misrepresentation and concealment in the negotiation of the lease and awarded Solid Restaurant Ventures compensatory damages, the bulk of which were for Pauly's lost profits. Orozco also sought equitable relief from Vornado and Cole in the form of rescission of the lease and guaranty. The trial court ruled that Orozco was not entitled to rescission of the guaranty, and neither Orozco nor Solid Restaurant Ventures was entitled to attorney's fees.

2

Vornado, Solid Restaurant Ventures, and Orozco have all appealed to this court, alleging either error by the jury or the trial court or both. On appeal, Vornado maintains that the jury verdict that it committed the tort of intentional misrepresentation and the jury's award of lost profits lacked substantial evidence. Vornado also argues that the trial court erred in admitting expert testimony offered by Solid Restaurant Ventures' expert on lost profits. Orozco has cross-appealed the trial court's finding that he was not entitled to rescission of the guaranty. Orozco and Solid Restaurant Ventures have filed a separate appeal of the trial court's denial of attorney's fees.

For reasons that we will explain, we conclude that substantial evidence supports both the jury finding that Vornado committed the tort of intentional misrepresentation and the jury's award of lost profits. We find no error in the trial court's admission of Solid Restaurant Ventures' expert testimony. We therefore find no merit in Vornado's attack on the judgment. However, as to Orozco's cross-appeal regarding rescission of the guaranty, we conclude that the trial court erred in finding that Orozco was not entitled to rescission of that agreement. Accordingly, we reverse the judgment.

With respect to Orozco's and Solid Restaurant Ventures' appeal of the trial court's ruling on attorney's fees, we affirm the order's conclusion that neither was entitled to attorney's fees under the terms of the lease and Civil Code section 1717. Nevertheless, we reverse the attorney's fees order because we conclude that Orozco has prevailed in part by obtaining rescission of the guaranty and is therefore entitled to attorney's fees pursuant to its attorney's fees provision. We remand the case to the trial court for determination of the amount of attorney's fees due to Orozco under the guaranty.

## I. FACTS AND PROCEDURAL BACKGROUND

These facts are taken from certain undisputed facts and the evidence presented to the jury. We resolve any conflicts in the evidence—including credibility of witnesses—in favor of the jury's findings. (See *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920,

3

925–926 (*Nestle*).)  Because Vornado challenges the sufficiency of the evidence, we discuss the facts elicited at trial in some detail.

A. *Pauly's at the Plant*

Orozco, who had extensive experience in the restaurant business and had already developed a successful chain of "quick-service"[1] Mexican-style restaurants, decided to launch a new restaurant concept focused on quick-service gourmet hot dogs, sausages, and specialty fries.  Orozco named his concept "Pauly's Famous Franks N Fries."  After investigating various locations, he identified the Plant, a shopping center in San Jose, as the best location for the first Pauly's.  Orozco chose the Plant in part because of its existing mix of restaurants.  Although he knew certain vendors at the Plant, such as Five Guys Burgers & Fries (Five Guys), sold hot dogs, Orozco was not worried about competition from them because hot dogs were "ancillary" products for them.

In May 2011, Orozco contacted Amber Weltner, who worked for Vornado Realty Trust and its subsidiary WPV San Jose, LLC (later succeeded by Vornado San Jose, LLC) (collectively, Vornado), and who was responsible for negotiating leases at the Plant.  Weltner's job was to lease space at the Plant as quickly as possible, and she earned commission for the leases she negotiated in addition to her salary.

Orozco had approximately ten conversations and at least six face-to-face meetings with Weltner before signing the lease at the Plant at the end of September 2011.  At their first in-person meeting, Orozco told Weltner about his new restaurant concept and its focus on gourmet hot dogs—including a "Chicago style" hot dog—as well as sausages and specialty fries.  Orozco also explained to Weltner he was interested in the Plant because he liked its mix of tenants and thought his product would be unique.  After Weltner informed him there were only about three unoccupied spaces available, he asked

---

[1] An expert witness defined a "quick-service" restaurant for the jury as an establishment "where you went up to the counter, you ordered your food, they put it out on a counter, and you picked it up."

4

her which other tenants were coming to the Plant. Weltner told Orozco that she could not answer his question about the identity of any new tenants because it was against Vornado's policy to discuss ongoing negotiations. In fact, there was no policy against Weltner divulging information about prospective tenants; she chose not to do so as a "negotiation skill."

Orozco first requested a space between the restaurants Wingstop and Five Guys, but that space was already leased out. Orozco told Weltner that he had investigated Five Guys and felt it would not compete with his own restaurant. Orozco emphasized to Weltner that it was important for him to evaluate operations that were selling hot dogs.

At another meeting, Orozco again asked Weltner about incoming tenants, and she again did not answer on grounds that it was against company policy. Orozco told her he did not care about the names but instead was more interested to know whether Vornado was considering tenants for the Plant that would offer either concepts or products that would compete with his own business. Weltner responded there were not.

At subsequent meetings Orozco would ask Weltner the same question whether they were considering any other restaurants with either competing concepts or products. Each time she told Orozco no.

While she was negotiating with Orozco, Weltner was also personally negotiating a lease at the Plant with another business that sold hot dogs, sausages, and french fries: a restaurant chain founded in Chicago called "Al's Beef." On July 7, 2011, the president of Al's Beef's parent company raised several issues with Weltner, including his need for "exclusive" language in the lease for Al's Beef to the effect that the Plant would not allow another tenant to sell "Italian Beef sandwiches, Italian Sausage sandwiches and/or Hot Dog sandwiches" as its primary business and that Al's Beef "shall have the unrestricted and exclusive right to sell said products and services." Weltner responded that she could not agree to the proposed "exclusive" language and later also noted that "there are others in the center that this would [a]ffect." Ultimately, Al's Beef received a

5

more limited exclusive in its lease to sell hot beef sandwiches, a fact Orozco discovered only in 2014 in the course of litigation.

Based on the request by Al's Beef for an "exclusive" for hot beef, sausage, and hot dog sandwiches, Weltner knew that hot dogs and sausage products were likely an important part of Al's Beef's business. Weltner never told Orozco that Al's Beef had requested an exclusive for hot dogs, or even that Al's Beef was coming to the Plant. Weltner did not believe she needed to tell Orozco about Al's Beef because she believed Al's Beef primarily sold beef sandwiches, not hot dogs. Weltner secured a fully executed lease from Al's Beef before Orozco signed his lease.

Shortly before signing the lease at the Plant, Orozco formed a limited liability company named Solid Restaurant Ventures, LLC (Solid Restaurant Ventures) to operate Pauly's. At the end of September 2011, Orozco signed a 10-year lease on behalf of Solid Restaurant Ventures for retail space at the Plant, effective October 20, 2011. On the day Orozco signed the lease, he again asked Weltner if there were any other restaurants being considered for the Plant that would offer competing concepts or competing products. She said no. Orozco told Weltner that this information was "critical" for him, and he testified at trial that he would not have entered the lease had he known at the time that Al's Beef had signed a lease for space at the Plant. Orozco believed it was reasonable to rely on Weltner in part because he believed her and viewed her as a professional who worked for "a reputable large company." For her work securing the Pauly's and Al's Beef leases, Weltner received thousands of dollars in commissions.

Orozco did not read the entire 80-page lease before signing it because, in his view, the "major deal points" were included in the front part of the lease. The lease contained an integration clause as well as several disclaimers indicating that the landlord had not made any representations about other tenants, including future tenants, at the Plant. For example, the lease stated that the site plan attached to the lease did not constitute any

6

"representation or warranty as to current occupancy or future occupancy of any particular tenant in the Shopping Center."

The lease also included an exhibit entitled "Prohibited Uses and Exclusive Uses," that prohibited Solid Restaurant Ventures from using its premises for "exclusive uses set forth in leases of currently existing tenants in the Shopping Center" as listed in the exhibit. For instance, the exhibit's list included a reference to Five Guys and indicated that the landlord of the Plant could not execute a lease with another tenant within a certain area of the site plan whose primary business was "the sale of hamburgers, cheeseburgers and french fries." Al's Beef does not appear on this exhibit and was not referenced anywhere in the lease for Pauly's.

In addition to signing the lease on behalf of his wholly-owned subsidiary, Solid Restaurant Ventures, Orozco also signed in his individual capacity a "Guaranty of Lease" (the guaranty). The guaranty was included with the lease and another document entitled "Tenant's Estoppel" in "one bundle" for him to sign. The guaranty provided that Orozco "absolutely and unconditionally guarantee[d] and promise[d] to Landlord the due, punctual and full performance by Tenant" of the lease's obligations, including the payment of rent. The guaranty included a provision entitling a prevailing party "in an action against the other arising out of or in connection with this Guaranty" to "recover from the other attorneys' fees and costs, including collection costs incurred."

After signing the lease for the space at the Plant, Orozco began extensive preparations for Pauly's, including engaging in construction for approximately five months. In April 2012, approximately seven months after he had signed the lease on behalf of Solid Restaurant Ventures and while he was about 30 percent of the way through the construction phase for Pauly's, Orozco discovered Al's Beef was coming to the Plant when he saw a "coming soon" sign about two doors down from Pauly's.[2]

---

[2] Pauly's and Al's Beef were separated by one other business and a breezeway.

Orozco called the property manager for the Plant and told her that Al's Beef was a "big problem." After a representative of the Plant emailed Orozco a copy of Al's Beef's menu, Orozco responded in an email that he saw a "HUGE conflict here" and that Al's Beef would "undercut" his own business given their "sausage and hotdog [*sic*] offering and pricing." The property manager for the Plant, Nancy Wooten, testified that she recalled Orozco was "upset," and that she had told him that Al's Beef was having "financial problems." Orozco was told by the landlord not to worry about Al's Beef because of these financial issues, and Orozco proceeded with construction.

In late October 2012, Pauly's at the Plant opened for business. The opening was a success, with lines out the door. Sales continued to increase at Pauly's even beyond this opening period. According to Brian Skarbek, the financial advisor for Pauly's who maintained its financial records, the sales at Pauly's "trended up" about 15 percent for the time period from November 2012 through shortly before Al's Beef later opened in April 2013. Multiple witnesses testified that Pauly's was well-managed. At trial, the defense's sole expert, Robert Patterson, conceded that Pauly's sales were "good" in the two weeks prior to the opening of Al's Beef.

The jury also heard testimony that Vornado was in the process of selling the Plant in 2012, culminating in Cole's purchase of the shopping center in April 2013. A sales offering memorandum produced for Vornado touted the Plant as being over 95 percent leased and offering an array of "quick-serve" restaurants, including Pauly's. The memorandum further noted that the Plant had "[e]xceptionally strong food-service tenant sales performance of approximately $640 per square foot." The witness for Cole acknowledged that Cole considered the high tenant occupancy rate of the Plant, as well as this figure of $640 price per square foot in its decision to acquire the shopping center.

In mid-April 2013 (approximately six months after Pauly's debut), Al's Beef opened for business at the Plant. Within one week, the sales at Pauly's had declined by approximately 24 percent. Pauly's sales dropped by roughly 35 percent over a

8

three-week period, and Orozco's financial advisor, Skarbek, estimated sales declined by approximately 30 percent overall. The defense's expert, Patterson, also testified he saw a decline of roughly 30 percent in sales, which he viewed as caused by Al's Beef opening "to some extent."

Skarbek eventually advised Orozco that he should close Pauly's. About six months after the opening of Al's Beef, in November 2013, Orozco closed Pauly's due to dramatically declining sales.

In August 2013, three months before the closing of Pauly's at the Plant, Orozco and Solid Restaurant Ventures filed a lawsuit against Vornado and the business entities that had acquired the Plant, namely Cole MT San Jose CA, LP, Cole Real Estate Investments, Cole Credit Property Trust IV, Inc., and Cole GP MT San Jose CA, LLC (collectively, Cole).[3] Orozco and Solid Restaurant Ventures alleged three fraud causes of action–negligent misrepresentation, intentional fraud, and fraudulent concealment– against the defendants based on the theory that the defendants had committed fraud in the negotiation of the lease (that is, fraud in the inducement of the contract). They further alleged a fourth cause of action for "rescission, restitution and damages," a fifth cause of action for unfair business practices in violation of Business and Professions Code section 17200, and a sixth cause of action for declaratory relief, which they later amended to include a claim for reformation "based on fraud and/or mistake."[4] Orozco and Solid Restaurant Ventures did not allege any breach of contract claims or otherwise argue that the defendants had violated any provision of the lease.

As detailed further below, the trial court first conducted a jury trial on the fraud claims. After the jury found that Vornado had committed fraud, the jury next considered

---

[3] The trial court later granted Cole's motion for nonsuit, which the parties do not challenge on appeal.

[4] Orozco and Solid Restaurant Ventures later dismissed their unfair business practices claim, and it is not the subject of any appeal before us.

damages. Following the jury's award of damages, the trial court ruled on the claims sounding in equity. After entering judgment, the trial court issued an order on attorney's fees.

B. *Jury Trial*

1. Liability Phase

The trial court bifurcated the jury trial into liability and damages phases, which were heard by the same jury. Trial in the liability phase consisted of approximately 10 court days of witness testimony, during which the parties presented evidence on Vornado's liability on the first, second, and third causes of action related to fraud, as well as whether the underlying conduct of Vornado constituted "malice, oppression, or fraud" sufficient to warrant punitive damages.

The jury unanimously found Vornado liable to Solid Restaurant Ventures for the tort of intentional misrepresentation and, by a vote of 11 to 1, found Vornado liable to Solid Restaurant Ventures for the tort of fraudulent concealment. Because of these verdicts, the jury did not reach the negligent misrepresentation claim. The jury also did not find that the underlying conduct of the Vornado defendants constituted "malice, oppression, or fraud" sufficient to warrant punitive damages. None of the parties challenges on appeal either the jury's finding that punitive damages were not warranted or its failure to reach the negligence claim.

2. Damages Phase

The damages portion of the jury trial consisted of two days of witness testimony. We discuss the evidence presented in this phase of the trial in more detail in our examination of Vornado's claim that the jury's finding of damages lacked substantial evidence. Ultimately, the jury awarded $872,141 in total damages to Solid Restaurant Ventures, which was comprised of: (i) $676,967 for lost profits; (ii) $129,462 for operational losses incurred by Pauly's at the Plant; and (iii) $65,712 for startup costs for

10

another Pauly's, located in downtown San Jose.  Vornado challenges on appeal only the lost profits award.

C. *Trial Court's Ruling on Rescission of the Guaranty and Entry of Judgment*

Following the jury's verdicts, the trial court turned to the task of determining the remaining equitable issues, including rescission.  Orozco and Solid Restaurant Ventures moved the trial court for rescission of the lease and guaranty, among other claims.  They also sought a declaration that the lease and guaranty were unenforceable because the agreements had been procured by fraud.

The trial court issued a tentative decision stating that lost profits damages were not available to Solid Restaurant Ventures if it elected to rescind the lease.  Solid Restaurant Ventures then declined the remedy of rescission and elected to proceed under the jury verdict for fraud and concealment with its corresponding damages award of $872,141.  Orozco continued to seek rescission of the guaranty.  The trial court found that Orozco was not entitled to rescission of the guaranty.  We discuss the trial court's reasoning more fully below in our examination of Orozco's contention that the trial court erred in this ruling.

On March 30, 2016, the trial court entered judgment.  The judgment stated that Solid Restaurant Ventures shall recover $872,141 in damages with interest from Vornado for the fraudulent misrepresentation and concealment causes of action.  Regarding rescission of the guaranty, the trial court rejected that remedy as to Orozco and entered judgment in favor of Vornado and Cole.  As to the cause of action for declaratory relief, the trial court ruled it was "impossible and unnecessary" to issue the requested relief and declined to do so.

Following the judgment, Vornado moved both for a new trial and judgment notwithstanding the verdict.  The trial court denied both motions.  Vornado timely appealed the judgment entered on March 30, 2016, as well as the postjudgment order denying its motion for judgment notwithstanding the verdict and motion for new trial.

11

Orozco filed a cross-appeal from the judgment. This court assigned Vornado's appeal (including Orozco's cross appeal) case No. H044014.

### D. Trial Court's Ruling on Attorney's Fees

Several months after the trial court entered judgment, Solid Restaurant Ventures and Orozco moved in the trial court for attorney's fees and costs (totaling over $700,000) pursuant to both Civil Code section 1717 and the attorney's fees provisions in the lease and guaranty. The trial court found Civil Code section 1717 inapplicable because the key issue in the case was fraud in the inducement rather than any action on a contract and denied the motion. The trial court did not address Orozco's request for attorney's fees pursuant to the guaranty. Orozco and Solid Restaurant Ventures filed a separate appeal of the trial court's postjudgment order denying their request for attorney's fees, to which this court assigned case No. H044062.

Pursuant to an order previously issued by this court, we consider appeals H044014 and H044062 together.

## II. DISCUSSION

Vornado attacks the judgment on two grounds. First, it argues that the jury's finding that Solid Restaurant Ventures justifiably relied on any misrepresentation was not supported by sufficient evidence. Second, it contends there was insufficient evidence to support the jury's award of lost profits damages. As explained further below, we reject Vornado's contentions that the judgment should be reversed on either of these grounds.[5]

In his cross-appeal of the judgment, Orozco contends the judgment should be reversed because he was entitled to rescind the guaranty, and the trial court erred in

---

[5] In its notice of appeal, Vornado also stated that it was appealing the trial court's postjudgment order denying their motion for judgment notwithstanding the verdict and motion for new trial. However, Vornado's briefing does not raise any substantive arguments related to that order beyond mentioning the general standard of review for such motions. Accordingly, Vornado has forfeited any claimed error as to the trial court's rulings on those postjudgment motions. (See *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 948.)

12

refusing to do so. We agree with Orozco and therefore reverse this aspect of the judgment.

In their separate appeal, Orozco and Solid Restaurant Ventures argue that the trial court erred in denying them attorney's fees under Civil Code section 1717. Alternatively, Orozco argues he is entitled to attorney's fees as the prevailing party under the attorney's fee provision in the guaranty. We agree, but only as to the latter argument. Accordingly, we reverse the trial court's postjudgment order relating to attorney's fees and remand to the trial court for determination of the amount of attorney's fees Orozco incurred in prevailing in rescission of the guaranty.

A. *Reasonable Reliance*

Vornado contends that there was insufficient evidence to support the jury's finding that Vornado had committed the tort of intentional misrepresentation. Before turning to the merits of Vornado's claim, we address Solid Restaurant Ventures' contention that Vornado has waived the claim by failing to summarize both the unfavorable as well as the favorable evidence.

1. Vornado's Recitation of the Facts on Appeal

"When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, internal quotation marks omitted.) " '[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) We do not reweigh evidence or reassess the credibility of witnesses. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.) We are "not a second trier of fact." (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021.)

13

A party presenting an argument of insufficient evidence may not simply reargue its version of the facts but rather has a duty to "set forth the version of events most favorable to [respondents]"; indeed, "[w]here a party presents only facts and inferences favorable to his or her position, the 'contention that the findings are not supported by substantial evidence may be deemed waived.' " (See *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737–738.)

Vornado's briefing falls short of this standard. For example, in making its argument that the facts do not show reasonable reliance, Vornado fails to mention Orozco's testimony about the many instances in which he asked Vornado's employee Weltner about any competing concepts or restaurants, her answer that there were no such competitors, and Orozco's statements to Weltner emphasizing the importance of knowing which other restaurants at the Plant would be selling hot dogs. While Orozco and Solid Restaurant Ventures point out such deficiencies in Vornado's briefing, they do not explicitly request that we determine Vornado has forfeited its claim on appeal. We do not find Vornado's failure to summarize all of the evidence so egregious that we should deem its arguments forfeited. Therefore, we will consider the merits of its contentions. (See *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.)

2. Substantial Evidence of Reasonable Reliance

" ' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." ' " (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1239.) After reviewing the trial record, we have little difficulty finding that it contains ample evidence to support the jury's unanimous factual finding that Orozco reasonably relied on Vornado's misrepresentations.

Vornado contends that the jury's finding that Solid Restaurant Ventures reasonably relied on a false representation made by Vornado lacked substantial evidence. The crux of Vornado's argument is that Solid Restaurant Ventures' reliance was not

14

reasonable because Orozco was negligent in failing to read the lease (which clearly stated that Vornado was not making any promises about any of the other tenants at the Plant) and because Orozco failed to negotiate his own written "exclusive" for hot dogs. Vornado contends that Orozco's behavior was especially unreasonable in light of his lengthy experience in the restaurant industry.

As an initial matter, the issue of Orozco's failure to read the entire lease is not dispositive, given the ample evidence of fraud. (See *Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 232–233.) Even if Orozco had read the entire contract, he would not necessarily have been alerted to Vornado's false representations. This case is therefore distinguishable from cases in which oral representations are "patently at odds with the express provisions of the written contract," rendering reliance on oral statements unreasonable as a matter of law. (See *Hadland v. NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578, 1589.) As the California Supreme Court has observed: "The best reason for allowing fraud and similar undermining factors to be proven extrinsically is the obvious one: if there was fraud, or a mistake or some form of illegality, it is unlikely that it was bargained over or will be recited in the document." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1177.)

The evidence heard by the jury contained substantial evidence that Orozco told Weltner multiple times about his culinary concept and asked her many times, including on the day he signed the lease on behalf of Solid Restaurant Ventures, whether restaurants with either competing concepts or products were being considered. Each time she told Orozco no. At trial, Weltner testified at times that she did not "recall" such conversations, but she never denied they happened. Orozco further testified that he trusted Weltner given that she was a "professional" and worked for a "supposedly reputable company." Based on this evidence, it appears clear that the jury found Orozco's testimony credible, and its resolution of conflicting evidence upon the fact question of justifiable reliance is "conclusive upon this reviewing court." (*Horn v.*

15

*Guaranty Chevrolet Motors* (1969) 270 Cal.App.2d 477, 483; see also *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 ["The testimony of a witness, even the party himself, may be sufficient."].)

This case is thus distinguishable from the cases cited by Vornado in support of its contention that the jury lacked sufficient evidence of reasonable reliance. For example, *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, on which Vornado relies, related to a dispute over a commercial lease involving a shopping center, in which the tenant alleged fraud against the landlord based on misrepresentations it claimed the landlord made about other tenants at the center. (*Id*. at pp. 291–292.) The court held that the landlord had demonstrated as a matter of law that the tenant could not have justifiably relied on such misrepresentations under the particular circumstances, including the "complete absence of any actions taken to question, clarify, or confirm the contractual status" of other cotenants in a shopping center. (*Id*. at p. 303.) By contrast, Orozco asked Weltner multiple times whether potential competitors were being considered for the remaining leases. In addition, Vornado's reliance on *Rosenthal v. Great Western Fin. Securities Corp*. (1996) 14 Cal.4th 394 is misplaced. The fraud claim at issue in that case was that the actual terms of the written contract were different than had been represented, rather than that the plaintiff was fraudulently induced to enter into the contract. (*Id*. at p. 419.)

Here, Orozco would not have discovered the misrepresentations by reading the lease, which did not even mention Al's Beef. There is ample evidence that Orozco did not know about Al's Beef until after he signed the lease and had begun construction for Pauly's. Weltner told him that no competing restaurants were being considered for the few remaining spaces at the shopping center, including the space that was in close proximity to Pauly's. When Orozco first learned that Al's Beef was going to open virtually next door, the Plant's manager (also a Vornado employee) played down Orozco's fears by emphasizing that Al's Beef was experiencing financial difficulties.

16

Finally, it is well-established that the kind of disclaimers and exculpatory documents—such as the "estoppel" attached to the lease and signed by Orozco that disavowed any representations made by landlord or its agents to him—do not operate to insulate defrauding parties from liability or preclude Orozco from demonstrating justifiable reliance on misrepresentations. (*McClain v. Octagon Plaza, LLC* (2008) 159 Cal.App.4th 784, 794–795.) Here the jurors received a special instruction on reasonable reliance and disclaimers that instructed them that they could consider the presence of such disclaimers as one of the "factors" in their determination.[6] In essence, Vornado asks us on appeal to reweigh these factors in their favor, even though we must give "considerable deference" to the factfinder's determinations. (See *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1066.) Applying such deference, we conclude that substantial evidence supports the jury's finding that Solid Restaurant Ventures reasonably relied on Weltner's statements.[7]

---

[6] The trial court gave the jury a special instruction titled "Reasonable Reliance – Effect of Disclaimer," which stated: "Provisions in contracts stating that the agreement is the sole agreement between the parties and supersedes any and all prior oral or written agreements or understandings among them pertaining to the transaction and that no express or implied representations have been made, as well as other absolving contractual provisions, do not insulate a party from the consequences of its fraud. [¶] However, in determining whether Solid Restaurant Ventures, LLC's reliance on the alleged misrepresentation or alleged concealment was reasonable, you may consider whether the lease agreement and/or Tenant's Estoppel expressly disavowed any purported representations. [¶] You may also consider whether Solid Restaurant Ventures, LLC had a lawyer assist with lease review, whether Solid Restaurant Ventures, LLC asked for changes in the lease documentation, whether Solid Restaurant Ventures, LLC asked questions and any responses given, whether Solid Restaurant Ventures, LLC communicated the importance of its concerns about whether others were being considered as prospective tenants who offered competing concepts or who offered competing products. These are some, but not all, of the factors you may consider in making this determination."

[7] Having concluded that substantial evidence supported the jury's determination of reasonable reliance, we need not address Solid Restaurant Ventures' argument that

As Vornado does not attack any other aspects of the jury's finding that it committed the tort of intentional misrepresentation, we reject Vornado's claim that the jury erroneously found it liable on this ground.

B. *Lost Profits*

Vornado also contends that insufficient evidence supports the jury's award of lost profits. As described above, after hearing the evidence related to damages, the jury returned with a verdict awarding Solid Restaurant Ventures compensatory damages totaling $872,141, which included a unanimous verdict for damages representing "Startup costs for the Plant or lost profits for [Pauly's at] the Plant" totaling $676,967.[8]

1. Evidence Presented at Trial

We briefly present the evidence heard by the jury related to lost profits. We resolve any conflicts in the evidence in favor of the jury's findings as to Solid Restaurant Ventures' damages.[9] (*Nestle*, *supra*, 6 Cal.3d at pp. 925–926.)

Orozco testified that Pauly's had been profitable for five months during the period before Al's Beef opened. Skarbek, Orozco's bookkeeper and financial advisor, testified how he calculated and extrapolated Pauly's lost profits using the historical weekly sales data that existed from when Pauly's was in operation and before the opening of Al's Beef. From this historical sales data and consistent with his financial services practice for other restaurant clients, Skarbek created a "trend line," that is, a "straight line that's the best fit to all those data points," in order to get a prediction of future sales. Skarbek

Vornado "invited error" by proposing the wording of the jury instruction addressing reasonable reliance.

[8] Vornado does not challenge the other components of the jury award for damages, specifically the separate awards for operational losses for the Plant, and startup costs for the Pauly's location in downtown San Jose.

[9] Although Orozco also claimed individual damages, the trial court did not permit him to put on evidence at trial as to his individual damages. Orozco does not challenge that ruling on appeal.

did not include in his analysis the first four weeks of sales data from when Pauly's first opened as he opined that this "honeymoon period" was not predictive of future sales.

More specifically, Skarbek graphed the weekly sales numbers that existed for the 21 weeks of sales at Pauly's starting from the week ending November 25, 2012 through the week ending April 14, 2013 (the week before Al's Beef opened). He observed from the numbers as well as the trend line he applied to those numbers that—prior to Al's Beef opening—the customer base and weekly sales at Pauly's were increasing. He therefore, in collaboration with Jeff Back (another expert for Solid Restaurant Ventures), concluded that it was reasonable to predict that weekly sales would increase going forward and to apply the trend line further to determine what the future sales would be on a "year-by-year basis for the lease."

After Skarbek calculated those yearly amounts through the life of the lease, he then deducted expenses—such as for costs of goods, labor, overhead, and rent—to arrive at a net income by year. For example, for the first year, he and Back projected a "very reasonable" income of $59,915 based on total sales of $586,861. For the nine years following, he and Back concluded that the growth rate would "temper some amount" or "level out to some degree." Accordingly, they used a smaller growth number for the later years and through the date of March 31, 2022, the end of the lease, and increased sales numbers by just 5 percent to account for inflation and a minimal increase in customer base. Ultimately, Skarbek calculated lost profits as totaling over $1.6 million over the life of the 10-year lease.

Skarbek then discounted these lost profits to net present value. In his words, "[a] higher reward, higher risk venture would carry a higher discount rate when reducing it to today's dollars. A lower risk, lower reward venture would carry a lower rate." He testified initially in favor of using a 5 percent discount rate, which yielded a lost profits figure of approximately $1.4 million (discounting the figure of $1.6 million). He felt this rate was appropriate for this "high risk, high reward" context and was still "very

19

moderate as far as reward." For comparison purposes, he noted that applying a 26 percent discount rate (as used by the defense's expert), he calculated approximately $924,932 and using a 12 percent discount rate he calculated approximately $1.2 million in lost profits.

On cross-examination, Skarbek acknowledged he had made a mistake in his interpretation of the data sheet that he relied upon to justify the 5 percent discount rate, as he conceded that the numbers he relied on for that lower percentage represented the risk premium figures rather than the discount rate. He testified that the discount rate could be higher but should be no more than 12 percent. He further explained that a 26 percent discount rate reflected a scenario where there was a higher degree of volatility and uncertainty in Pauly's business, which he opined was inappropriate for Pauly's given it was already "showing profit" and was run by an "industry veteran."

The defense offered the expert testimony of Patterson, a consultant in the hospitality industry and who had also testified during the liability phase. In his 10-year projection of profits, Patterson relied on the same weekly sales data used by Skarbek, that is the 21 weeks of data from just after the "honeymoon period" to the week before the opening of Al's Beef. Patterson also relied on many of Skarbek's computations of costs, such as labor costs, that he considered "reasonable." However, based on his analysis and applying a discount rate of 26 percent, Patterson calculated Pauly's lost profits as $498,192.

Patterson had not worked for a new "quick service" restaurant, and he testified that he did not know how to compute a trend line and was instead basing his computation on averages rather than any trend. On rebuttal, Back, who had also testified during the liability phase and is a "restaurant broker," described how he had worked with Skarbek to "conceptual[ize]" the lost profits analysis in order to keep the assumptions and projections "moderate."

20

Ultimately, the jury returned with a verdict awarding Solid Restaurant Ventures damages in the total amount of $872,141, including an award of lost profits for Pauly's at the Plant totaling $676,967.[10]

2. Admission of Expert Testimony

Before turning to the issue of evidence in support of the lost profits verdict, we first address Vornado's argument that the trial court abused its discretion in allowing Skarbek, whom it characterizes as "incompetent," to testify as an expert in the damages phase of the trial. Vornado contends that the trial court erred in allowing admission of this testimony because Skarbek had no experience with lost profits and based his conclusions on "flawed methodology and flawed assumptions."

We conclude that Vornado waived this contention by failing to object to Skarbek's qualifications to testify as an expert in the damages phase of the trial. "It is hornbook law that a timely and specific objection is required to prevent the consideration of certain evidence; the failure to object at all waives any claim of error." (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1611.) Although Vornado contends it sufficiently preserved such an objection, our review of the record shows otherwise. In arguing against waiver, Vornado points principally to objections its counsel made in the liability phase of the trial as to Skarbek's lack of qualifications as an accountant and expertise in "accounting practices," as well as other objections based on the relevancy of Skarbek's testimony to the jury's determination of Vornado's liability.

During the damages phase of the trial, the trial court specifically asked Vornado's counsel whether Skarbek should be qualified as an expert regarding "trend line" issues, and Vornado's counsel responded that he had "[n]o objection." Regarding Skarbek's application of a discount rate to reduce the lost profits amount to present value, defense

---

[10] Although the special verdict allowed for the jury to award damages either as start-up costs or lost profits for Pauly's at the Plant, there is no dispute that the jury awarded lost profits rather than start-up costs.

counsel also posed no objection to Skarbek's qualifications. Indeed, defense counsel stated that "my objections will go to the weight, so we won't object to this." Defense counsel also conducted a voir dire on Skarbek's prior experience in doing a lost profits analysis but never lodged any objection to Skarbek's qualifications to testify as an expert in the damages phase during or after his voir dire. In short, Vornado has waived any objection as to Skarbek's competence to testify about lost profits.

In any event, we have reviewed the testimony of Skarbek and see no basis for concluding that the trial court abused its discretion in allowing Skarbek to testify as an expert. Skarbek had experience in providing financial services to restaurants, including analyzing trending sales, and he possessed relevant education in accounting, finance, and statistics. The trial court's gatekeeping role as to expert testimony, including as to lost profits, is to determine "whether the expert opinion is founded on sound logic," rather than to assess its "persuasiveness." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772 (*Sargon*).) "Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion." (*Id*. at p. 773.)

Skarbek's testimony relied on actual sales data generated by Pauly's, and Skarbek made logical extrapolations of that data to arrive at his conclusions. As the California Supreme Court has cautioned, "[t]he lost profit inquiry is always speculative to some degree. Inevitably, there will always be an element of uncertainty. Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been. Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative. A reasonable certainty only is required, not absolute certainty." (*Sargon*, *supra*, 55 Cal.4th at p. 775.) A "trial court's gatekeeping role does not involve choosing between competing expert opinions" but rather a trial court "must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is

22

based on a leap of logic or conjecture." (*Id*. at p. 772.) Applying these principles, we conclude the trial court did not abuse its discretion in allowing Skarbek to testify as an expert about Pauly's lost profits.

### 3. Substantial Evidence of Lost Profits

We now turn to Vornado's contention that the jury lacked sufficient evidence to make its determination as to the amount of lost profits for Pauly's location at the Plant over the 10 years of the lease. We review a lost profits award for substantial evidence. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759–760.)

The California Supreme Court set out in *Sargon* the standard for the appropriate calculation of lost business profits. "Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses." (*Sargon*, *supra*, 55 Cal.4th at p. 774.) " 'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions.' " (*Ibid*., [quoting *Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161–162.].)

" 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' " (*Sargon*, *supra*, 55 Cal.4th at p. 774, [quoting *Grupe v. Glick* (1945) 26 Cal.2d 680, 692–693.].)

23

" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.' " (*Sargon*, *supra*, 55 Cal.4th at pp. 774775, [quoting *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873–874.].)

As an initial matter, we note that Vornado mischaracterizes Pauly's as an "unestablished" business. As there is no dispute that Pauly's operated for approximately one year at the Plant, Pauly's was to some degree "established." Therefore, there was a "track record" by which to base the projections of future lost profits, which is what both sides' experts in fact did when they used 21 weeks of Pauly's actual sales data. (See *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2014) 222 Cal.App.4th 945, 975 [finding substantial evidence supporting a lost profits calculation where the business "does not fit neatly into the established business versus new business paradigm"].) Moreover, there is also substantial evidence to support the *occurrence* of lost profits damages, given Orozco's testimony that Pauly's was profitable for five months prior to the opening of Al's Beef, and both Skarbek's and Back's testimony that opined that lost profits could be projected forward through the life of the lease. (See *Sargon*, *supra*, 55 Cal.4th at p. 778.)

While Vornado argues now that Pauly's was a new and untested concept with an uncertain likelihood of success, it ignores contradictory evidence, including the conclusion of its own senior executive, who approved Pauly's 10-year lease and concluded at the time that Pauly's had a high likelihood of success. Indeed, the defense's own expert, Patterson, reviewed the same underlying sales data and did not assert that lost profits were zero or nominal, but rather testified that Pauly's lost profits would

amount to approximately $500,000 and, with interest, would have a value of approximately $600,000. As described above, the jury ultimately awarded $676,967 in lost profits.

Vornado also argues the evidence supporting the jury's award of lost profits is insufficient because Solid Restaurant Ventures presented no evidence of the experience of similar businesses to demonstrate prospective profits. Vornado misconstrues the caselaw. Even in cases of unestablished businesses, while a plaintiff may base its lost profits on the experience of comparable businesses, there is no requirement that it must do so. (See, e.g., *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 873.) Pauly's was an established business (albeit one with a short track record) rather than an unestablished business. In sum, having reviewed the various experts' testimony and other evidence in the record, we conclude that there is substantial evidence that lost profits were reasonably certain to occur.

" 'The question as to the amount of damages is a question of fact.' " (See *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 648.) After having reviewed the evidence presented at trial, we conclude that the amount of the jury's lost profits award is supported by substantial evidence. Based on the raw sales data that actually existed for Pauly's at the Plant, Skarbek provided distinct calculations of the lost profit estimates, and he specified the different assumptions on which they were based and how he arrived at these particular amounts. Skarbek and Back both testified as to how they conceptualized and analyzed moderate lost profits over a 10-year lease for this "quick service" restaurant. Vornado's own expert, Patterson, using his own analysis and applying a discount rate of 26 percent (and then an interest rate of 7 percent annually), concluded that Pauly's had lost profits in the amount of approximately $600,000. The jury ultimately awarded $676,967, an amount that was less than any of the estimates of loss profits provided by Skarbek, but only slightly more than that supplied by the defense expert.

Ultimately, Vornado's arguments on appeal misconstrue the substantial evidence standard of review by asking us to draw inferences in its favor—for example, that the trend line used by Skarbek was not a "good fit" to the sales data or that daily rather than weekly sales data should have been used. As a reviewing court, we do not sit as a trier of fact nor do we assess the credibility of expert witnesses. Moreover, Vornado's own expert conceded he had no expertise in trend lines to effectively rebut this evidence, and he relied on the same sales data that Skarbek did.

Vornado also challenges the discount rate used by Skarbek as "unreasonable," although the jury heard various discount figures (as well as differing growth rates used by the experts) that were lower or higher. We have already determined that the trial court did not err in admitting Skarbek's testimony, and Vornado has not persuaded us that Skarbek's testimony on this point was so unreasonable that it should have been excluded. (See *Sargon*, *supra*, 55 Cal.4th at p. 772.)

In any event, although Vornado attacks the 5 percent discount rate that Skarbek initially applied, it is clear from the record that the jury did not award this amount, nor did it even accept the larger discount rate of 12 percent that Skarbek later testified might be appropriate. The discount rate selected by the jury ultimately depended on the jury's determination of the riskiness of Pauly's business over the 10-year period of the lease. The jury's determination of riskiness (as embodied in its selection of an appropriate discount rate) represents a factual determination that we do not disturb on appeal. (See *Nguyen v. Los Angeles County Harbor/UCLA Medical Center* (1995) 40 Cal.App.4th 1433, 1450.)

It is of no moment that the jury's lost profits calculation ultimately did not precisely match any of the figures testified to by the parties' experts. As one court has noted about a jury's determination of economic damages based on expert testimony, "between black and white are various shades of gray, and all of the colors of the rainbow as well," and "[w]e refuse to transform the jury's inherently subjective task of calculating

26

damages into a mechanical exercise of voting to accept or reject the testimony of any witness in toto." (*Abbott v. Taz Express* (1998) 67 Cal.App.4th 853, 855.)  We find no error either in the trial court's decision to admit Skarbek's testimony or in the jury's determination of Pauly's lost profits, including its determination of a discount rate.

For these reasons, we reject all of Vornado's claims against the judgment.

### C.  *Rescission of the Guaranty*

We now turn to Orozco's cross-appeal of the judgment challenging the trial court's ruling and subsequent judgment that Orozco was not entitled to rescission of the guaranty.  We review the trial court's decision whether to grant relief based on rescission for abuse of discretion.  (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1387 (*Wong*).) " 'However, that discretion is not an arbitrary one, but should be exercised in accord with the principles and precedents of equity jurisprudence.' " (*Ibid.*)  " 'As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact . . . .  As to the trial court's conclusions of law, . . . review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion.' " (*O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1124.)

#### 1. Procedural Background

Both Solid Restaurant Ventures and Orozco sought rescission of the lease and guaranty.  Following the jury trial and prior to the trial court's final ruling on the request for rescission, the parties filed a written stipulation that stated:  "The parties hereto hereby stipulate that all procedural and proof requirements of conditions necessary for rescission of the lease and the guaranty have been satisfied.  However, defendants reserve their rights to seek vacation of the rescission determination (including any attendant

damage awards) should the jury verdict for fraud and concealment for any reason be vacated, whether at the trial court level . . . or on appeal."[11]

Following the stipulation, the trial court stated in an oral ruling that it would not award lost profits damages if a party elected rescission as the remedy. Thereafter, Solid Restaurant Ventures elected damages rather than rescission. Orozco continued to pursue the remedy of rescission. At a subsequent hearing, the trial court ruled that Orozco was not entitled to rescind the guaranty. The trial court stated, "the Court concludes and it is ruling that Mr. Orozco, as conceded by the plaintiff, he doesn't have any individual damages for fraud or concealment; that's why it didn't go to the jury. Furthermore, he doesn't have damages under recision [*sic*] damages. So according to *Molfino vs. Levinson* [(1947) 79 Cal.App.2d 587] . . ., I don't believe he's entitled to recision [*sic*] of the guaranty." The trial court continued, "Furthermore, I don't think that the lease and the guaranty can be separated, and we cannot have inconsistent verdicts. So if he is–the plaintiffs are going to affirm the lease, then they are affirming the guaranty. So Mr. Orozco is not entitled to recision [*sic*] for those two reasons."

Following this oral ruling, the trial court issued a written judgment that stated in relevant part, "plaintiff [Solid Restaurant Ventures] declined the remedy of rescission, and elected the remedy granted by the jury verdict for fraud and concealment by which it was entitled to a judgment for fraud and concealment in the total amount of $872,141. [¶] Plaintiff Paul Orozco, in his individual capacity, continued to seek rescission of the personal guaranty. The Court ruled that since Paul Orozco had no individual damages, he was not entitled to rescission under the authority of *Molfino v. Levinson Produce Co.* (1947) 79 Cal.App.2d 587 and that the lease and guaranty could not be treated separately, especially where [Solid Restaurant Ventures] affirmed the contract. Plaintiffs cannot

---

[11] The stipulation is titled "Stipulation Between Plaintiffs and Defendants" (some capitalization omitted) and includes Cole in the case caption. As Cole is not a party to this appeal, we express no view on the effect of the stipulation as to Cole.

28

elect inconsistent remedies by obtaining damages on their Second and Third Causes of Action and also rescinding the guaranty, entitled Guaranty of Lease. The Court denied Paul Orozco's request for rescission."

2. Legal Analysis

In general, a party to a contract may rescind a contract on the ground that it was obtained through fraud. (Civ. Code, § 1689.) "In the usual case of fraud, where the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable. In that case, the party seeking to void the contract must rescind under our statutory and common law rules." (*Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 921, citations and internal quotation marks omitted.) "[A] person claiming to be defrauded by false representation has a choice of two inconsistent remedies to wit, he may elect to rescind the contract; or, to affirm it and claim damages. He cannot do both. The right to damages exists unless and until the transaction is effectually disaffirmed." (*Evans v. Rancho Royale Hotel Co.* (1952) 114 Cal.App.2d 503, 507.)

We first address the trial court's ruling that Orozco did not suffer any "individual damages" and therefore could not rescind the guaranty. As a factual matter, the trial court's finding lacks substantial evidence in light of Vornado's stipulation (unchallenged on appeal) that "all procedural and proof requirements of conditions necessary for rescission of the lease and the guaranty have been satisfied."[12] Beyond the stipulation, there is ample evidence in the record that Orozco was injured by virtue of entering into a

_____

[12] The parties do not challenge on appeal the trial court's grant of Cole's motion for nonsuit. However, Orozco's cross-appeal in case H044014 seeks rescission of his guaranty associated with the lease at the Plant against both Vornado and Cole. While Orozco contends that Cole is a successor in interest to the guaranty, Orozco did not make Cole a party to this appeal. In addition, the record on appeal does not contain the final agreements between Cole and Vornado setting out the terms of the sale of the Plant to Cole. Therefore, we address rescission of the guaranty only as to Vornado.

29

guaranty, under which he assumed individual responsibility to answer for the obligations of the tenant under the lease, that he would not have freely entered into if he had known about Al's Beef.

In any event, it is well-settled that a party may rescind a contract even where the party does not suffer any pecuniary loss. In a decision issued several years after the appellate court's decision in *Molfino*, the California Supreme Court rejected the implication that "in every case there must be 'pecuniary' loss to obtain rescission for fraud." (*Earl v. Saks & Co.* (1951) 36 Cal.2d 602, 611.) In *Earl* the Supreme Court noted that injury could arise from the inability to make a "free choice": "In a sense, anyone who is fraudulently induced to enter into a contract is 'injured'; his 'interest in making a free choice and in exercising his own best judgment in making decisions with respect to economic transactions and enterprises has been interfered with.' " (*Ibid.*)

A long line of decisions after *Earl* has emphasized that a party does not have to suffer any pecuniary loss to rescind a contract that it was induced to enter into through fraud. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 979 [discussing the *Earl* decision and holding "[i]t follows that a defrauded party does not have to show pecuniary damages in order to defeat a petition to compel arbitration" based on fraudulent inducement]; *Esparza v. Specht* (1976) 55 Cal.App.3d 1, 6 [noting that a party to a promissory note who alleged fraud had the option of rescission on an action for fraud and if he chose rescission "he would be allowed to cancel the agreement regardless of damage"]; *Austin v. Duggan* (1958) 162 Cal.App.2d 580, 584 [holding the rule is "well settled" that when a plaintiff elects to rescind a contract "proof of pecuniary loss is not required"].) Accordingly, the trial court erred in determining that Orozco was not entitled to rescission because he did not incur individual damages.

We now turn to the second ground for the trial court's ruling—namely its determination that the lease and guaranty were not separate instruments and therefore Orozco could not elect rescission where the tenant (Solid Restaurant Ventures) had

30

elected damages and affirmed the lease. We note that neither the trial court's oral nor written order cites any legal authority for the proposition that whether Orozco was entitled to rescission of the guaranty turned on whether the lease and guaranty could be "treated separately." In defending the trial court's ruling, Vornado similarly does not cite any authority for this point, and our independent research has not located any.

"Where a person has two concurrent remedies to obtain relief on the same state of facts, and these remedies are inconsistent, he must choose or elect between them; and if he has clearly elected to proceed on one, he is bound by this election and cannot thereafter pursue the other." (*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1218 (*Denevi*).) However, this rule does not apply where claims are "brought on behalf and for the benefit of two distinct juridical persons." (*Id*. at p. 1219.) "In the absence of a cogent demonstration to the contrary, we must presume that each claimant was entitled to pursue his or its own remedies, even if the underlying rights to relief arose from a single act or course of conduct on the part of defendants." (*Ibid*.) That Orozco brought fraud claims against Vornado both as an individual and on behalf of Solid Restaurant Ventures, which he wholly owned, did not limit him to pursing a single remedy after the jury finding of fraud. "[I]t is settled that one who has suffered injury both as an owner of a corporate entity and in an individual capacity is entitled to pursue remedies in both capacities." (*Id*. at p. 1221.)

In other words, the trial court asked the wrong question before concluding that "the lease and guaranty could not be treated separately." The relevant question was not whether the lease and guaranty were separate but instead whether Orozco and Solid Restaurant Ventures were legally separate entities. (*Denevi*, *supra*, 121 Cal.App.4th at p. 1218.) As they were legally distinct entities, they may pursue—and receive—separate remedies for Vornado's fraud.

"The guarantor's obligation rests on the contract of guaranty, not on the note itself, and an action against the guarantor must be brought on the contract of guaranty."

31

(*Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485, 1505.) Conversely, a creditor has a separate obligation to the guarantor or surety and "must not misrepresent or conceal facts so as to induce or permit the surety to enter or continue in the relationship in reliance on a false impression as to the nature of the risk. As with other contracts, a creditor's fraud, which may consist of intentional or negligent misrepresentation or active suppression of the truth, will discharge the surety as to any subsequently incurred liability." (*Sumitomo Bank of Cal. v. Iwasaki* (1968) 70 Cal.2d 81, 85.)

Vornado does not argue that it is impossible or impracticable to award Orozco rescission of the guaranty and to award Solid Restaurant Ventures damages for lost profits based on the jury finding of fraudulent inducement in the lease. Vornado's trial counsel told the trial court that, in light of the jury's finding of fraud, the lease was not enforceable. Furthermore, nothing in the language of the guaranty forecloses Orozco from seeking its rescission. The provision in the guaranty that addresses election of remedies provides that Orozco "hereby waives and agrees not to assert or take advantage of . . . (d) any right or defense arising by reason of the . . . cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant." This language does not limit Orozco's own right to rescind the guaranty for fraud.

The trial court's ruling denying rescission of the guaranty to Orozco is based on facts that are contradicted by the stipulation. In addition, the ruling rests on two incorrect legal conclusions—first, that Orozco was required to show individual damages to be entitled to rescission and second, that Orozco's right to pursue a remedy distinct from that selected by Solid Restaurant Ventures turned on whether the lease and guaranty were a single agreement or multiple agreements. Because the trial court's order was premised on these factual and legal errors, we conclude that the trial court abused its discretion in denying Orozco the remedy of rescission. We therefore reverse the judgment and remand

32

to the trial court to effectuate Orozco's rescission of the guaranty as to Vornado.[13] (See *Wong*, *supra*, 237 Cal.App.4th at p. 1389.)

D. *Attorney's Fees*

Solid Restaurant Ventures and Orozco separately appeal the trial court's order denying their requests for attorney's fees (totaling over $700,000). Solid Restaurant Ventures and Orozco contend they are entitled to attorney's fees based on the fee provision in the lease and under Civil Code section 1717, which provides for reciprocal application of an otherwise one-sided attorney's fees clause when the action is "on the contract." (Civ. Code, § 1717, subd. (a).) Orozco further maintains that the guaranty contains a separate attorney's fees clause that provides an independent contractual basis to award him attorney's fees.

Vornado contends that no attorney's fees are justified here given that the underlying action is not "on a contract" but rather sounds in fraud. Vornado does not separately address Orozco's claim that he is entitled to attorney's fees under the guaranty, but Vornado maintains that the trial court correctly ruled that Orozco was not entitled to rescission of the guaranty.

"On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law. In other words, 'it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.' In this case, where the material facts are largely not in dispute, our review is de novo." (*Mountain Air*

---

[13] As Cole is not a party to this appeal, we express no opinion on Orozco's rescission of the guaranty as to Cole.

*Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*), internal quotation marks and citations omitted.)

"Under the American rule, each party to a lawsuit ordinarily pays its own attorney fees. Code of Civil Procedure section 1021, which codifies this rule, provides: 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . .' Thus, '[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.' " (*Mountain Air*, *supra*, 3 Cal.5th at p. 751.)

"If such litigation does sound in contract, however, an agreement allocating attorney fees may be 'within the scope of [Civil Code] section 1717' and subject to its restrictions. [Citation.] 'Before section 1717 comes into play, it is necessary to determine whether the parties entered an agreement for the payment of attorney fees, and if so, the scope of the attorney fee agreement.' [Citation.] This determination requires us to apply traditional rules of contract interpretation." (*Mountain Air*, *supra*, 3 Cal.5th at p. 752, fn. omitted.)

Accordingly, we start with the language of the lease's attorney's fees provision. (*Mountain Air*, *supra*, 3 Cal.5th at p. 751.) The lease between Solid Restaurant Ventures and WPV San Jose, LLC (part of Vornado) contained the following fees provision, which indisputably is unilateral to the benefit of Vornado (the landlord), not Solid Restaurant Ventures (the tenant): "In the event that, at any time after the date of this Lease, Landlord shall (i) consult with and/or retain an attorney as a result of Tenant's breach of this Lease, (ii) prepare and/or serve a valid notice of default under this Lease and seek the cure of such default, or (iii) institute any action or proceeding against Tenant relating to or arising from the provisions of this Lease or any default hereunder, Tenant shall reimburse Landlord for its expenses, actual attorneys' fees, and all fees, costs and expenses incurred in connection with such consultation, pursuit of rights, action or

34

proceeding . . . ." Under this unilateral language, Solid Restaurant Ventures would never be entitled to attorney's fees for any action or proceeding arising out of the provisions of the lease.

However, despite the one-sided nature of this provision, Civil Code section 1717 "make[s] reciprocal any provision awarding attorney's fees regardless of any wording purporting to make the right unilateral." (*Wilson's Heating & Air Conditioning v. Wells Fargo Bank* (1988) 202 Cal.App.3d 1326, 1332.) "The primary purpose of [Civil Code] section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 (*Santisas*).)

In particular, Civil Code section 1717, subdivision (a) provides, "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

The requirement under Civil Code section 1717 that the action be "on a contract" has been liberally construed. (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 240.) As one court has stated, " ' "[i]t is difficult to draw definitively from case law any general rule regarding what actions and causes of action will be deemed to be 'on a contract' for purposes of [Civil Code section] 1717." ' " (*Id.* at p. 241.) "Nevertheless, we distill . . . the following principle: An action (or cause of action) is 'on a contract' for purposes of section 1717 if (1) the action (or cause of action) 'involves' an agreement, in the sense that the action (or cause of action) arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement, and (2) the agreement contains an attorney fees clause." (*Id.* at pp. 241–242.)

35

Although the phrase "on a contract" in Civil Code section 1717 has been liberally construed, it does not stretch to tort claims. " '[T]ort claims do not "enforce" a contract' and are not considered actions on a contract for purposes of section 1717." (*Kangarlou v. Progressive Title Co., Inc.* (2005) 128 Cal.App.4th 1174, 1178.) "By its terms . . . [Civil Code] section 1717 has a limited application. It covers only contract actions, where the theory of the case is breach of contract, and where the contract sued upon itself specifically provides for an award of attorney fees incurred to enforce that contract." (*Xuereb v. Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1342.) It "is well settled that '. . . an action for fraud seeking damages sounds in tort, and is not "on a contract" for purposes of an attorney fee award, even though the underlying transaction in which the fraud occurred involved a contract containing an attorney fee clause.' " (*Loube v. Loube* (1998) 64 Cal.App.4th 421, 430, [quoting *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 549 and citing other cases.].) Furthermore, when a cause of action based on a contract which includes an attorney's fees provision is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under Civil Code section 1717 only as they relate to the contract action. (*Santisas*, *supra*, 17 Cal.4th at p. 615.)

Although Solid Restaurant Ventures and Orozco's claims relate to the lease, "a cause of action does not warrant a recovery under . . . [Civil Code] section 1717 merely because a contract with an attorney's fees provision is part of the backdrop of the case." (*Perry v. Robertson* (1988) 201 Cal.App.3d 333, 343 (*Perry*).) Even if the parties have a contractual relationship, "[a] tort action for fraud arising out of a contract is not . . . an action 'on a contract' within the meaning of [Civil Code section 1717]." (*Stout v. Turney* (1978) 22 Cal.3d 718, 730; see also *Moallem v. Coldwell Banker Com. Group, Inc.* (1994) 25 Cal.App.4th 1827, 1833 [observing "[i]n this case the asymmetry of statutory rights between contract and tort litigants painfully appears, because [appellant] could

have invoked [Civil Code] section 1717 had he prevailed on his contract claim instead of his tort claims"].)

Solid Restaurant Ventures and Orozco point to their complaint and maintain they also raised equitable claims relating to the lease (for instance, in the form of declaratory relief and reformation). However, whether a complaint pleads contract causes of action is not dispositive to the application of Civil Code section 1717. Instead, courts look to the gravamen of the overall action. (See *Hyduke's Valley Motors v. Lobel Financial Corp.* (2010) 189 Cal.App.4th 430, 436 [holding that Civil Code section 1717 did not apply because gravamen of the action was not to enforce anyone's rights under the contract containing attorney's fees provision].) As a leading treatise on California attorney's fees has stated in discussing the many cases interpreting Civil Code section 1717, "An action is more likely to be found 'on a contract' for purposes of [section 1717] if the agreement is broad in scope or if the main thrust of the litigation is based on the contract." (Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar, 3d ed. 2018) § 4.50.)

Here, the fee clause in the lease is not broadly worded. While Orozco and Solid Restaurant Ventures contend the provision is "broad," in fact its text limits its application to actions "arising from the provisions of this Lease or any default hereunder." Moreover, the overall dispute proceeded to trial solely on three fraud causes of action. The key question at trial was whether Vornado fraudulently induced Solid Restaurant Ventures to enter into the long-term lease. Neither Orozco nor Solid Restaurant Ventures argued that Vornado had breached the lease in any way. Similarly, Orozco's and Solid Restaurant Ventures' action did not seek to interpret or enforce any provision in the lease or guaranty.

Civil Code "section 1717 is only meant to establish reciprocity of provisions for attorney's fees for enforcement of the contract," and when a party recovers on a legal theory of fraud in the inducement of a contract such actions "seek[ ] to avoid the contract rather than to enforce it." (*Perry*, *supra*, 201 Cal.App.3d at pp. 342–343; see also *Exxess*

37

*Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 709 [claims for constructive fraud and breach of fiduciary duty were not brought to enforce terms of a lease and were not "on the contract" within the meaning of Civil Code section 1717].)

*California-American Water Co. v. Marina Coast Water Dist.* (2017) 18 Cal.App.5th 571 (*California-American*), upon which Solid Restaurant Ventures and Orozco rely, does not support their contention that their suit was "on a contract" within the meaning of Civil Code section 1717. In *California-American*, the plaintiff brought an action seeking to declare contracts related to a public water project void based on a conflict of interest. (*California-American*, at pp. 574–575.) The defendant cross-claimed that the contracts were valid and enforceable. (*Id.* at p. 575.)

Relying on *Santisas*, *supra*, 17 Cal.4th 599, the court in *California-American* noted that Civil Code section 1717 "safeguards mutuality of remedy in two circumstances. The first, which is inapplicable here, is when a contract expressly provides the right to collect attorney fees to one party but not the other. [Citation.] The second, which is applicable and controlling here, 'is when a person sued on a contract containing a provision for attorney fees to the prevailing party defends the litigation " 'by successfully arguing the inapplicability, invalidity, unenforceability, or nonexistence of the same contract.' " ' " (*California-American*, *supra*, 18 Cal.App.5th at p. 577 [quoting *Santisas*, at p. 611], italics omitted.)

*California-American* thus did not address the circumstance under Civil Code section 1717 potentially applicable here, namely a contract involving a unilateral attorney's fees provision. Nor did it involve tort claims. In addition, *California-American* cited with approval the statement that " 'Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded … ¶ In the final analysis we look to the pleading to determine the nature of plaintiff's claim.' " (*California-American*, *supra*, 18 CalApp.5th at p. 578, quoting *Arthur L. Sachs, Inc. v. City of Oceanside* (1984) 151 Cal.App.3d 315, 322.)

38

Contrary to the contention of Solid Restaurant Ventures and Orozco that *California-American* marked a shift in determining whether an action is "on a contract" under Civil Code section 1717, *California-American* reiterated longstanding interpretive principles that counsel us to look to the overall nature of Solid Restaurant Ventures' and Orozco's complaint. Applying those principles, we conclude that the overall nature of their complaint sounded in tort and was not "on a contract."

Despite these well-settled principles, Orozco and Solid Restaurant Ventures maintain that the California Supreme Court's recent decision in *Mountain Air* compels an award of attorney's fees in this action. We disagree. *Mountain Air* involved a "breach of contract action" brought against the backdrop of a complex real estate transaction. (*Mountain Air*, *supra*, 3 Cal.5th at p. 747.) The California Supreme Court emphasized that, "[i]f litigation . . . *sound[s] in contract* . . . an agreement allocating attorney fees may be 'within the scope of [Civil Code] section 1717' and subject to its restrictions." (*Id.* at p. 752, italics added.)

The claims brought by the plaintiffs in *Mountain Air* involved breach of contract rather than tort claims. (*Mountain Air*, *supra*, 3 Cal.5th at pp. 748–749.) The question the California Supreme Court confronted in *Mountain Air* was whether the attorney's fee provision in one contract (the option agreement) was triggered by a suit for breach of contract in a related agreement. (*Id.* at pp. 752–753.) To resolve this question, the Supreme Court analyzed the specific contractual language in the option agreement. The court did not analyze the phrase "action on a contract" in Civil Code section 1717 at all. (*Mountain Air*, at pp. 756–761.)

Here, by contrast, Solid Restaurant Ventures' and Orozco's entitlement to attorney's fees does not depend on the attorney's fee provision in the lease (which, by its terms, benefits only Vornado) but instead on the reciprocal entitlement to fees afforded by the operation of Civil Code section 1717. Solid Restaurant Ventures prevailed solely on two tort claims against Vornado. Under these facts, Solid Restaurant Ventures' and

39

Orozco's suit was not an "action on a contract," and thus Civil Code section 1717 does not provide a basis for an award of attorney's fees.[14] As Solid Restaurant Ventures and Orozco do not argue they were otherwise entitled to attorney's fees under the terms of the lease, we affirm the trial court's denial of attorney's fees to Solid Restaurant Ventures and Orozco under the lease.

However, we reach a different conclusion as to Orozco's claim for attorney's fees pursuant to the guaranty. The guaranty includes a provision entitling a prevailing party in "an action against the other arising out of or in connection with this Guaranty" the right to "recover from the other attorneys' fees and costs, including collection costs incurred." This expansive language, which applies to any prevailing party (unlike the unilateral language of the lease's attorney's fee provision) is sufficient to encompass Orozco's fraud action and rescission remedy. (*Lerner v. Ward* (1993) 13 Cal.App.4th 155, 159–161 [clause allowing fees in any action or proceeding arising out of the agreement includes a fraud action arising out of the agreement].) As discussed above, Orozco is entitled to rescind the guaranty as to Vornado. He has therefore prevailed in an action arising from the guaranty and is entitled to attorney's fees incurred in connection with his action related to the guaranty.

Therefore, the order denying Orozco's motion for attorney's fees is reversed and the matter is remanded to the trial court for a determination of the amount of reasonable attorney's fees to be awarded to Orozco in connection with his action related to the guaranty. We express no opinion on the amount of attorney's fees that the trial court in its "wide discretion" should award on remand. (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1297.)

---

[14] Because we conclude the action here was not "on a contract," we need not reach the parties' arguments on the separate question under Civil Code section 1717 of which party prevailed on the contract. (Civ. Code, § 1717, subds. (a) & (b)(1).)

40

## III.  DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its judgment of March 30, 2016, and to modify its judgment to effectuate Orozco's rescission of the guaranty as to Vornado.  In all other respects, the trial court should reenter its judgment.

The order denying Orozco and Solid Restaurant Ventures' motion for attorney's fees is reversed.  On remand, the trial court is directed to determine the attorney's fees Orozco incurred in prevailing on his request for rescissionary relief under the guaranty.  The trial court shall then enter a new order denying Solid Restaurant Ventures' and Orozco's request for attorney's fees under Civil Code section 1717 and granting Orozco his reasonable attorney's fees under the guaranty.  Costs on appeal are awarded to Orozco in case H044062 and to Solid Restaurant Ventures and Orozco in case H044014.  (Cal. Rules of Court, rule 8.278(a).)

41

_____

                                 DANNER, J.

WE CONCUR:

_____

MIHARA, ACTING, P.J.

_____

GROVER, J.

*Orozco et al. v. WPV San Jose LLC et al.*
**H044014, H044062**

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-13-CV-252116 |
| Trial Judge: | Hon. Carrie A. Zepeda |
| Counsel for Plaintiff/Appellant Paul Orozco and Plaintiff/Respondent Solid Restaurant Ventures, LLC (H044014)<br><br>Counsel for Plaintiffs/Appellants Paul Orozco and Solid Restaurant Ventures, LLC (H044062) | Terra Law LLP<br>D.D. Hughmanick<br>James A. McDaniel |
| Counsel for Defendants/Appellants WPV San Jose LLC and Vornado Realty Trust (H044014)<br><br>Counsel for Defendants/Respondents WPV San Jose LLC and Vornado Realty Trust (H044062) | Greenberg Traurig, LLP<br>William J. Goines<br>Cindy Hamilton<br>Scott Donald Bertzyk<br>Greenberg Traurig, LLP |

*Orozco et al. v. WPV San Jose LLC et al.*
**H0440144, H044062**